[No. 57696-3. En Banc. September 16, 1993.]

WASHINGTON STATE PHYSICIANS INSURANCE EXCHANGE & ASSOCIATION, ET AL, *Respondents*, v. FISONS CORPORATION, *Appellant*.

300

304

*Bogle & Gates, Ronald E. McKinstry, Ronald T. Schaps, Guy P. Michelson, Kevin C. Baumgardner, Karen McGaffey,* and *William Helsell,* for appellant.

*Williams, Kastner & Gibbs,* by *Mary H. Spillane* and *Margaret A. Sundberg; Carney Badley Smith & Spellman, P.S.,* by *James E. Lobsenz* and *Stephen A. Saltzburg,* for respondents.

*Laurie Kohli, Constance Gould,* and *Russell C. Love* on behalf of Washington Defense Trial Lawyers, amicus curiae.

*Halleck H. Hodgins, Mary Ellen Gaffney-Brown, Gary N. Bloom,* and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association, amicus curiae for respondents.

ANDERSEN, C.J. —

## FACTS OF CASE

We are asked in this case to decide whether a physician has a cause of action against a drug company for personal and professional injuries which he suffered when his patient had an adverse reaction to a drug he had prescribed. The physician claimed the drug company failed to warn him of the risks associated with the drug. If such action is legally

cognizable, we are then asked to determine whether damages awarded by the jury were excessive and whether attorneys' fees were properly awarded by the trial court. We are also asked to rule that the trial court erred in denying sanctions against the drug company for certain abuses in the discovery process.

The physician's action began as part of a malpractice and product liability suit brought on behalf of a child who was the physician's patient. On January 18, 1986, 2-year-old Jennifer Pollock suffered seizures which resulted in severe and permanent brain damage. It was determined that the seizures were caused by an excessive amount of theophylline in her system. The Pollocks sued Dr. James Klicpera (Jennifer's pediatrician), who had prescribed the drug, as well as Fisons Corporation (the drug manufacturer and hereafter drug company) which produced Somophyllin Oral Liquid, the theophylline-based medication prescribed for Jennifer.

Dr. Klicpera cross-claimed against the drug company both for contribution and for damages and attorneys' fees under the Consumer Protection Act as well as for damages for emotional distress.

In January 1989, after nearly 3 years of discovery, Dr. Klicpera, his partner and the Everett Clinic settled with the Pollocks. The settlement agreement essentially provided that the doctors' insurer, Washington State Physicians Insurance Exchange & Association (WSPIE), would loan $500,000 to the Pollocks which would be contributed in the event of a settlement between the Pollocks and the drug company. The Pollocks were guaranteed a minimum total recovery of $1 million, and in the event of trial Dr. Klicpera agreed to remain as a party and to pay a maximum of $1 million. The settlement between the Pollocks and Dr. Klicpera was determined by the trial court to be reasonable pursuant to RCW 4.22.060.

More than 1 year after this settlement, an attorney for the Pollocks provided Dr. Klicpera's attorney a copy of a letter received from an anonymous source. The letter, dated

June 30, 1981, indicated that the drug company was aware in 1981 of "life-threatening theophylline toxicity" in children who received the drug while suffering from viral infections. The letter was sent from the drug company to only a small number of what the company considered influential physicians. The letter stated that physicians needed to understand that theophylline can be a "capricious drug".

The Pollocks and Dr. Klicpera contended that their discovery requests should have produced the June 1981 letter and they moved for sanctions against the drug company. The request for sanctions was initially heard by a special discovery master, who denied sanctions, but who required the drug company to deliver all documents requested which related to theophylline. Documents that the drug company and its counsel had immediately available were to be produced by the day following the hearing before the special master. The remainder of the documents were to be produced within 2 weeks. The trial court subsequently denied Dr. Klicpera's request to reverse the discovery master's denial of sanctions and at the close of trial denied a renewed motion for sanctions.

The day after the hearing on sanctions, the drug company delivered approximately 10,000 documents to Dr. Klicpera's and Pollocks' attorneys. Among the documents provided was a July 10, 1985 memorandum from Cedric Grigg, director of medical communications for the drug company, to Bruce Simpson, vice president of sales and marketing for the company.

This 1985 memorandum referred to a dramatic increase in reports of serious toxicity to theophylline in early 1985 and also referred to the current recommended dosage as a significant "mistake" or "poor clinical judgment". The memo alluded to the "sinister aspect" that the physician who was the "pope" of theophylline dosage recommendation was a consultant to the pharmaceutical company that was the leading manufacturer of the drug and that this consultant was "heavily into [that company's] stocks". The memo also noted that the toxicity reports were not reported in the jour-

nal read by those who most often prescribed the drug and concluded that those physicians may not be aware of the "alarming increase in adverse reactions such as seizures, permanent brain damage and death". The memo concluded that the "epidemic of theophylline toxicity provides strong justification for our corporate decision to cease promotional activities with our theophylline line of products." The record at trial showed that the drug company continued to promote and sell theophylline after the date of this memo.

On April 27, 1990, shortly after the 1985 memo was revealed, the drug company settled with the Pollocks for $6.9 million. The trial court determined that settlement to be reasonable, dismissed the Pollocks' claims, extinguished Dr. Klicpera's contribution/indemnity claims against Fisons pursuant to RCW 4.22.060 and reserved determination of what claims remained for trial. The trial court then ordered the lawsuit recaptioned, essentially as Dr. James Klicpera, plaintiff v. Fisons Corporation, defendant.

After a month-long jury trial, the court instructed the jury on Dr. Klicpera's claims which were based on the Consumer Protection Act, RCW 19.86, the product liability act, RCW 7.72, and common law fraud. The jury was also instructed on WSPIE's fraud claim seeking to recover the $500,000 paid in settlement to the Pollocks. The trial court ruled that WSPIE could not maintain a Consumer Protection Act cause of action against the drug company.

On a special verdict form, the jury concluded that Dr. Klicpera was entitled to recover against the drug company under his Consumer Protection Act claim and under his product liability claim, but not under the fraud claim. The jury awarded Dr. Klicpera $150,000 for loss of professional consultations, $1,085,000 for injury to professional reputation, and $2,137,500 for physical and mental pain and suffering. The jury further found Dr. Klicpera to be 3.3 percent contributorily negligent. The jury found that WSPIE was not entitled to recover under its fraud claim against the drug company the $500,000 settlement paid to the Pollocks.

The trial court denied the drug company's motion for judgment n.o.v. and for a new trial. On a motion for reduction of the jury award, the trial court reduced the amount awarded for loss of professional consultations from $150,000 to $2,250 but refused to reduce the awards for loss of reputation and for pain and suffering. The trial court also denied WSPIE's motion for judgment n.o.v. or a new trial based on the dismissal of WSPIE's Consumer Protection Act claim.

The trial court awarded $449,568.18 to Dr. Klicpera as attorneys' fees under the Consumer Protection Act finding that 50 percent of the attorneys' time in the lawsuit was attributable to the Consumer Protection Act cause of action. The court denied Dr. Klicpera's request for further attorneys' fees based upon a theory of equitable indemnification.

Pursuant to the injunctive relief section of the Consumer Protection Act, the court ordered the drug company to send the June 30, 1981 letter regarding the dangers of theophylline poisoning to the Washington State Medical Association.

The drug company sought direct review by this court and we accepted review. Dr. Klicpera and his insurer (WSPIE) cross-appeal from the trial court's refusal to award discovery sanctions for the alleged discovery violations. WSPIE also appeals the trial court's dismissal of its Consumer Protection Act claim against the drug company.

The parties' 63 assignments of error raise 9 principal issues.

## ISSUES

ISSUE ONE. Under the Consumer Protection Act, RCW 19.86, does a physician whose reputation is injured because the physician misprescribed a medication have standing to sue a drug company which engaged in unfair or deceptive trade practices?

ISSUE TWO. Does a physician who prescribes a drug which injures a patient have a cause of action to recover from a drug company for the physician's own mental pain and suffering, and attendant physical pain, under the product liability act (RCW 7.72), based on the company's failure to warn?

ISSUE THREE. If the facts of this case fail to support a product liability claim, should this physician be allowed to bring a common law negligence cause of action based on the drug company's failure to warn about the risks of the drug?

ISSUE FOUR. Did the trial court err in refusing to allow the physician's insurer's Consumer Protection Act claim to go to the jury?

ISSUE FIVE. Did the trial court err in excluding the testimony of the drug company's sales representative based upon Rule of Evidence 406?

ISSUE SIX. Were the physician's state law claims preempted by federal law?

ISSUE SEVEN. Should the trial court have granted a new trial or reduced the jury award based on the argument that the damages awarded were excessive?

ISSUE EIGHT. Did the trial court err in calculating the amount of attorneys' fees awarded for the Consumer Protection Act claim?

ISSUE NINE. Did the trial court err in refusing to sanction the drug company and its attorneys for discovery abuse?

## DECISION

The general question in this case is whether damages may be awarded to a prescribing physician who is allegedly injured by a drug company's failure to give proper warning of the dangers of a drug which the physician prescribes to a patient and, if so, under what legal theory or theories and for what kind of damages.

ISSUE ONE.

CONCLUSION. Under the Consumer Protection Act (RCW 19.86), a physician whose reputation is injured has standing to sue a drug company which engaged in an unfair or deceptive trade practice by failing to warn the physician of the dangers of its drug about which it had knowledge.

The Washington Consumer Protection Act (CPA), RCW 19.86.020, provides:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

RCW 19.86.090 creates a private right of action by providing:

> *Any person who is injured* in his or her business or property by a violation of RCW 19.86.020 . . . may bring a civil action . . . to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including a reasonable attorney's fee . . .

(Italics ours.)

The elements of a private CPA claim are: (1) an unfair or deceptive act or practice; (2) which occurs in trade or commerce; (3) that impacts the public interest; (4) which causes injury to the plaintiff in his or her business or property; and (5) which injury is causally linked to the unfair or deceptive act.[1]

The drug company argues that Dr. Klicpera did not have standing to bring a CPA claim and relies upon *Bowe v. Eaton*, 17 Wn. App. 840, 846, 565 P.2d 826 (1977) for the proposition that the CPA only applies to unfair acts where there is a consumer transaction involving the sale of goods and services. Although *Bowe* does so provide, its holding has been eroded by later cases. In *Salois v. Mutual of Omaha Ins. Co.*, 90 Wn.2d 355, 359, 581 P.2d 1349 (1978), we held that the CPA includes sales but encompasses "more than just sales". In *Escalante v. Sentry Ins. Co.*, 49 Wn. App. 375, 387, 743 P.2d 832 (1987), *review denied*, 109 Wn.2d 1025 (1988), the court held that a passenger in an auto accident had standing to bring a CPA claim against an insurance company based upon the insurer's bad faith handling of a claim even though the injured party was not a party to the insurance contract, did not pay premiums and had no consumer relationship with the company.

The leading CPA case of *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 719 P.2d 531 (1986) does not include a requirement that a CPA claimant be a direct consumer or user of goods or in a direct

---

[1]*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986); *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 852, 792 P.2d 142 (1990).

contractual relationship with the defendant. Although the consumer protection statutes of some states require that the injured person be the same person who purchased goods or services, there is no language in the Washington act which requires that a CPA plaintiff be the consumer of goods or services.[2]

■ Additionally, in examining the nature of the relationship between a drug manufacturer, a prescribing physician and a patient, it is the physician who compares different products, selects the particular drug for the ultimate consumer and uses it as a tool of his or her professional trade. Under the learned intermediary doctrine, a drug company fulfills its duty by giving warnings regarding prescription drugs to the physician rather than to the patient.[3] This unique relationship results in the physician being comparable to the ordinary consumer in other settings. Some cases have concluded that it is the physician who stands in the shoes of the "ordinary consumer" of the drug.[4] Because of this unique relationship, the drug company targets its marketing efforts toward the physician, not toward the patient. The physician, therefore, is a logical person to be the "private attorney general"[5] under RCW 19.86.090. We therefore conclude that Dr. Klicpera did have standing to bring a CPA claim, and that the trial court did not err in submitting this claim to the jury.

At trial, the jury was properly instructed on the *Hangman Ridge* elements of a CPA cause of action. The jury found that

---

[2]RCW 19.86.090; Note, *New York Creates a Private Right of Action To Combat Consumer Fraud: Caveat Venditor*, 48 Brooklyn L. Rev. 509, 528 (1981-1982). *See Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 733 P.2d 208 (1987); *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 167, 795 P.2d 1143 (1990).

[3]*Terhune v. A.H. Robins Co.*, 90 Wn.2d 9, 13, 577 P.2d 975 (1978).

[4]*Phelps v. Sherwood Med. Indus.*, 836 F.2d 296, 302 (7th Cir. 1987); *Carmichael v. Reitz*, 17 Cal. App. 3d 958, 989, 95 Cal. Rptr. 381, 401 (1971).

[5]*Anhold v. Daniels*, 94 Wn.2d 40, 45, 614 P.2d 184 (1980); *Hangman Ridge*, 105 Wn.2d at 778, 788.

the drug company engaged in unfair or deceptive acts or practices. This determination is not challenged.

The drug company repeatedly stipulated to both the public interest element and to the trade or commerce requirement.

With regard to the causation element of the CPA, a causal link must exist between the deceptive act and the injury suffered.[6] Here, the jury was properly instructed that it had to find "[t]hat Fisons Corporation's unfair or deceptive act or practice was a proximate cause of the injury to plaintiff Dr. Klicpera's business or property,"[7] and it so found.

The drug company argues that the trial court erred in failing to dismiss the physician's claims on the basis that there was insufficient evidence of proximate cause because only the physician testified how he would have acted differently if he had been adequately warned. This argument addresses factual proximate cause rather than legal proximate cause, and the existence of factual causation is generally a question for the jury.[8]

In the present case the physician, in answer to a question regarding what he would have done if he had known of the information in the 1981 letter or in the 1985 memo, replied:

> With that information I would have not used that drug on Jennifer Pollock. And if Dr. Redding [the asthma specialist] had wanted that drug used, I would have let him prescribe and monitor it.

Report of Proceedings, at 1968. This is similar to the evidence in *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 753-56, 818 P.2d 1337 (1991), which we found was sufficient evidence to support a finding of proximate cause. The parents of the injured child in *Ayers* testified

---

[6]*Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d at 167; *Hangman Ridge*, 105 Wn.2d at 793.

[7]Instruction 10; Clerk's Papers, at 125.

[8]*Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 753-56, 818 P.2d 1337 (1991); *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 142, 727 P.2d 655 (1986); *Anderson v. Dreis & Krump Mfg. Corp.*, 48 Wn. App. 432, 441, 739 P.2d 1177, *review denied*, 109 Wn.2d 1006 (1987).

that if they had known of the risks of the product, they would have treated it more carefully. We concluded there that whether cause in fact existed was a jury question.

There is also corroborative testimony which supports the cause-in-fact element. Dr. Dorsey testified that had Dr. Klicpera known of the syndrome (reduced clearance of the drug during viral infections) he was certain Dr. Klicpera would have conducted the laboratory testing differently. Another physician, Dr. Koran, testified essentially that if proper warnings regarding viral infections had been given and followed, Jennifer Pollock would not have suffered seizures. Another doctor, Dr. Redding, also testified that if proper warning had been given, and followed, that Jennifer's seizures would not in all probability have occurred.

■ The drug company also argues that since there was evidence that the physician had been warned from other sources that further·warning would not have made a difference. The jury heard extensive evidence on this issue. While it is generally true that a drug manufacturer's failure to warn a prescribing physician cannot be the proximate cause of the patient's injury if the physician was already aware of the risk involved in the use of the drug,[9] that is not the evidence in this case. There was testimony from Dr. Klicpera from which a jury could conclude that although he had some knowledge of a correlation between viral infections and reduced clearance of theophylline, he did not know the alteration in clearance could be as dramatic or as rapid as the undisclosed Fisons memos and letter indicated.

One of the key disputed facts addressed throughout the trial is what Dr. Klicpera knew, or should have known, about theophylline from sources aside from the drug company's warning. The extent of the physician's knowledge was a jury question,[10] and the jury heard all of the evidence. We conclude that there was sufficient evidence to justify the proximate cause issue being submitted to the jury.

---

[9]3 *American Law of Products Liability* § 32:61 (3d ed. 1993).

[10]*See Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 818 P.2d 1337 (1991); *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 727 P.2d 655 (1986).

■ With regard to the injury element, we have held that damage to business reputation and loss of goodwill are compensable damages under the CPA.[11] The trial court's instructions properly allowed the jury to consider damage to professional reputation in regard to the CPA cause of action.

The drug company argues that the trial court erred because it allowed Dr. Klicpera to recover for "litigation related" damages. To the extent the drug company is arguing that direct "litigation related" damages were awarded, that is not supported by the record. The trial court ruled that Dr. Klicpera's "so-called litigation expense", including time loss due to attendance at deposition, preparation for trial, and at trial was *not* recoverable under any of the legal theories advanced.[12] No error was assigned to this ruling. No recovery was allowed to Dr. Klicpera based on any settlement made with the Pollocks or any loss of the physician's time during litigation.

The drug company also argues that Dr. Klicpera was suing based solely on his having been sued for malpractice by the Pollocks and that because he was determined to be 3.3 percent negligent[13] he would have been sued anyway, hence his cause of action should have been barred. This argument ignores the fact that the doctor's recovery was based upon an

---

[11]*Nordstrom*, 107 Wn.2d at 740-41; *see also Mason v. Mortgage Am. Inc.*, 114 Wn.2d at 854; *Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 530, 554 P.2d 1041 (1976) (holding that injury to reputation was included in the Fair Credit Reporting Act statutory term "actual damages").

[12]Report of Proceedings, at 3925-26.

[13]Apparently, for tactical reasons, each side argued counter to what would be expected on the issue of reduction of Consumer Protection Act damages based upon contributory negligence. Dr. Klicpera's attorney asked the court to reduce both the Consumer Protection Act and the product liability act awards by the 3.3 percent attributable to the doctor's contributory negligence, because one of the doctor's attorneys had previously made such a representation to the court. Report of Proceedings, at 4131-32. Fisons, however, asked the court *not* to reduce the Consumer Protection Act award based on contributory negligence. Report of Proceedings, at 4206, 4163. The trial court reduced damages awarded under the product liability act claim but not those awarded under the Consumer Protection Act. Report of Proceedings, at 4207. Whether contributory negligence should reduce a Consumer Protection Act award is not raised as an issue on appeal.

independent claim under the Consumer Protection Act. The claim brought by the physician was an independent action; it was not an indemnity claim based on the Pollocks' lawsuit. The Pollocks' malpractice lawsuit was not even a prerequisite of the doctor's claims against the drug company. As the Oregon Supreme Court pointed out in *Oksenholt v. Lederle Labs.*, 294 Or. 213, 217, 656 P.2d 293, 296 (1982), even if the patient had not sued the physician who prescribed the dangerous drug, knowledge of a physician's misprescription among patients and other physicians could harm the physician's reputation and cause economic loss.

Accordingly, we conclude that the jury's determination that Dr. Klicpera was 3.3 percent contributorily negligent does not bar his Consumer Protection Act cause of action which was based on the drug company's unfair or deceptive acts or practices.

In summary, given the liberal construction that is mandated by the CPA,[14] and the fact that the act does not require that the person injured be the actual consumer of goods or services, we perceive no legal justification to foreclosing a CPA action under the circumstances here presented.

The remaining question on this issue is whether damages for pain and suffering may be awarded under the CPA.[15] The damages which are recoverable under the CPA are injuries to plaintiff's "business or property".[16] We have not previously decided whether personal injuries are recoverable under a CPA claim.[17] In *Stevens v. Hyde Athletic Indus., Inc.*, 54 Wn. App. 366, 369, 773 P.2d 871 (1989), the court looked to federal law as directed in RCW 19.86.920 and quoted *Reiter v.*

---

[14]RCW 19.86.920.

[15]Although such damages were apparently awarded at trial under the product liability act (PLA) cause of action rather than the CPA cause of action, it is necessary for us to address this issue because of our subsequent conclusions regarding the PLA issue.

[16]RCW 19.86.090.

[17]*See Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 168, 795 P.2d 1143 (1990) (declining to decide if emotional damages are available under the CPA).

*Sonotone Corp.*, 442 U.S. 330, 339, 60 L. Ed. 2d 931, 99 S. Ct. 2326 (1979), which considered the phrase "injured in his business or property". As *Reiter* explained,

> The phrase "business or property" also retains restrictive significance. It would, for example, exclude personal injuries suffered.

■ The *Stevens* court, 54 Wn. App. at 370, concluded that had our Legislature intended to include actions for personal injury within the coverage of the CPA, it would have used a less restrictive phrase than injured in his or her "business or property".[18] We agree. Personal injuries are not compensable damages under the CPA. *See also Keyes v. Bollinger*, 31 Wn. App. 286, 295, 640 P.2d 1077 (1982), where it is noted that if a plaintiff suffers injury other than to "business or property", the injury is not compensable under the act. In fact, in this case, Dr. Klicpera's attorney conceded to the trial court that mental (and consequential physical) pain and suffering damages were not compensable under the Consumer Protection Act.

We therefore conclude that the damages the jury awarded for loss of reputation are compensable under the Consumer Protection Act claim, so long as the damages are supported by the evidence. However, the damages awarded for the physician's mental "pain and suffering" (and its objective physical manifestations) are not compensable under the CPA.

As the trial court and the litigants correctly recognized, such pain and suffering damages would only be compensable if a product liability action is cognizable under the facts of this case. This then brings us to the issue of whether the product liability cause of action was properly submitted to the jury.

ISSUE TWO.

CONCLUSION. We conclude that a physician who prescribes a drug which injures a patient does not have a cause of

---

[18]*See, e.g., Moore v. Eli Lilly & Co.*, 626 F. Supp. 365, 367 (D. Mass. 1986); *Hamman v. United States*, 267 F. Supp. 420, 432 (D. Mont. 1967).

action to recover from the drug company for his or her own emotional pain and suffering[19] under the product liability act (RCW 7.72).

The manufacturer's liability section of the product liability act, RCW 7.72.030(1), provides as follows:

> A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided.

In this case we are faced with the unusual situation of a plaintiff (who is not a relative of the injured party) seeking to recover pain and suffering damages as a result of the physical injury suffered by another. Because the Consumer Protection Act (which is a viable cause of action under these facts) does not allow this type of damages, we must determine whether under the facts presented the Legislature intended to allow such damages under the product liability act (PLA) (RCW 7.72).

Although the drug company asks us to disallow a products liability cause of action because the physician is not a proper "claimant" under the meaning of the PLA, or because these attenuated damages are not the proximate cause of the breach, we choose to resolve this case on narrower grounds. We perceive the most precise inquiry here to be whether these pain and suffering damages are the type of "harm" contemplated as recoverable by the Legislature under the PLA.

The PLA, RCW 7.72.010(6), defines "harm" as follows:

> "Harm" includes any damages *recognized by the courts of this state*: PROVIDED, That the term "harm" does not include direct or consequential economic loss . . .

(Italics ours.)

Although most of the definitional section of the Washington PLA was based upon the Model Uniform Product Liabil-

---

[19]Although the doctor testified he had developed stomach problems and taken antacid medication as a result of the stress of the lawsuit, the evidence regarding his pain and suffering was essentially relating to mental and emotional pain and suffering regarding his patient's injuries and the ensuing litigation.

ity Act,[20] the Senate Report[21] explains that the Select Committee on Tort and Product Liability Reform chose not to use the definition of "harm" contained in the uniform act and instead adopted a definition allowing for the continued development of the concept through case law. We must, therefore, look to Washington law to define "harm" for purposes of the PLA.[22]

▮ In this case, the product (the drug) harmed the child which in turn caused emotional distress to the prescribing physician for which he seeks to recover mental, and claimed physical, pain and suffering damages. We find no directly applicable product liability case law in this state. In prior Washington cases brought under the PLA, the "harm" involved has been for injury caused directly *by the product* to the person or the property of the claimant.[23] In this case, however, we are asked to extend recovery for a kind of harm that we do not perceive as having been contemplated by Washington law, that is, emotional distress suffered by a physician as a result of injury to his patient. We can find guidance in the cases wherein damages for emotional harm are available to a plaintiff based upon injuries to a third person. Generally, in cases where emotional distress is not a consequence of physical injury, or caused by intentional conduct, Washington courts have been cautious about extending a right to recovery, especially when the distress is the consequence of an injury suffered by a third person.[24] If the law

---

[20]Model Uniform Product Liability Act (UPLA), 44 Fed. Reg. 62,713 (1979); *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 763, 818 P.2d 1337 (1991).

[21]Senate Select Comm. on Tort & Product Liability Reform, *Final Report* 32 (Jan. 1981); *see also* Senate Journal, 47th Legislature (1981), at 630.

[22]Talmadge, *Washington's Product Liability Act*, 5 U. Puget Sound L. Rev. 1, 10 (1981-1982).

[23]*See, e.g., Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d at 763; *Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Gen. Constr. Co.*, 119 Wn.2d 334, 831 P.2d 724 (1992); *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 840 P.2d 860 (1992).

[24]*E.g., Gain v. Carroll Mill Co.*, 114 Wn.2d 254, 260, 787 P.2d 553 (1990).

were otherwise, liability would potentially be endless. Emotional damages caused by a plaintiff witnessing, or learning of, a third person's physical injuries are only compensable in Washington under very limited circumstances. For example, in *Gain v. Carroll Mill Co.*, 114 Wn.2d 254, 787 P.2d 553 (1990), which involved a negligent infliction of emotional distress action, mental distress damages were held *not* to be compensable even to close family members, when they were not present at the scene of a fatal accident.[25] If we were to allow emotional distress damages to be awarded to physicians as a result of injuries sustained by their patients, we would be substantially extending our prior law regarding when a plaintiff could recover emotional distress damages caused by the physical injuries of a third person. We decline to do so.

Our cases which involve intentional torts do not provide a basis to award damages for pain and suffering here. In those cases, emotional distress damages can be awarded as a component of total damages.[26] The level of fault involved in a PLA claim, however, may be considerably less than that in an intentional tort claim. In a product liability claim, liability can be predicated on negligence or even on strict liability.[27] Therefore, our intentional tort cases do not provide a state law basis for concluding that the physician's claimed harm here is compensable under the PLA.

Two cases in other jurisdictions have allowed professionals to recover their own damages when their patients were injured by a product. However, only pecuniary damages were recovered; emotional pain and suffering were either not sought or were disallowed. In *Oksenholt v. Lederle Labs.*, 294 Or. 213, 656 P.2d 293 (1982), a doctor who prescribed a drug which caused injury to his patient was allowed to recover lost earning capacity and lost income caused by harm to the

---

[25]*See also Hunsley v. Giard*, 87 Wn.2d 424, 553 P.2d 1096 (1976); *Schurk v. Christensen*, 80 Wn.2d 652, 497 P.2d 937 (1972).

[26]*See, e.g., Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d 477, 805 P.2d 800 (1991).

[27]*Falk v. Keene Corp.*, 113 Wn.2d 645, 782 P.2d 974 (1989).

physician's reputation. In *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504, 507, 448 N.E.2d 1332, 1334, 1336 (1983), a dentist who accidentally killed his patient due to defective equipment was allowed to recover pecuniary damages, but not damages for emotional injury which were a consequential result of the breach.

■ The product liability act was designed to address a liability insurance crisis which the Legislature felt threatened the availability of socially beneficial products and services.[28] We would not be furthering the intent of the Legislature if we extended liability so far that drug manufacturers would be chilled in marketing products and developing new ones. In the present case, a Consumer Protection Act claim was proved and substantial damages *were* awarded to the physician. We have upheld that. A physician may thus be able to recover pecuniary damages (damages to reputation); however, the physician's emotional pain and suffering are not recoverable under either the Consumer Protection Act or the product liability act.

Because we conclude that the facts of this case do not support a cause of action under the PLA for the doctor's pain and suffering damages, we need not address the drug company's other arguments as to why the PLA should not apply.

ISSUE THREE.

CONCLUSION. The Washington product liability act (RCW 7.72) created a single cause of action for product-related harms, and supplants previously existing common law remedies, including common law actions for negligence.

Dr. Klicpera argues that if a product liability claim under the PLA is disallowed by this court, we should then allow a negligence claim based upon the drug company's failure to warn of its product's dangers. We decline to do so. After the enactment of the PLA, such a claim is not viable in a products case.

---

[28]*Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 850, 774 P.2d 1199, 779 P.2d 697 (1989); RCW 7.72.010 Preamble; *Falk v. Keene Corp.*, 113 Wn.2d 645, 649, 782 P.2d 974 (1989); Talmadge, *Washington's Product Liability Act*, 5 U. Puget Sound L. Rev. 1 (1981-1982).

■ As we explained in *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 850-55, 860, 774 P.2d 1199, 779 P.2d 697 (1989), the PLA preempts traditional common law remedies for product-related harms. A claim previously based on negligence is within the definition of a product liability claim.[29] Since this present cause of action is predicated upon a failure to warn by a product manufacturer, any negligence cause of action therefor is now preempted by the PLA. Therefore, this product liability claim cannot be maintained on a common law negligence theory.[30]

The PLA does allow claimants to bring a Consumer Protection Act claim since that cause of action has been specifically exempted from the preemptive effect of the product liability act.[31]

ISSUE FOUR.

CONCLUSION. The trial court did not err in declining to allow WSPIE's Consumer Protection Act claim to be submitted to the jury.

Dr. Klicpera's insurer, WSPIE, argues that the $500,000 it paid to the Pollocks in settlement of the malpractice claim should have been recoverable from the drug company under the Consumer Protection Act. The trial court did allow WSPIE's fraud cause of action against the drug company to go to the jury. However, the jury found in favor of the defendant drug company on this issue. The trial court declined to allow WSPIE's Consumer Protection Act claim to be submitted to the jury. We agree.

■ Such an action is simply an indirect attempt to obtain contribution from the drug company. WSPIE, on behalf of Dr. Klicpera, paid $500,000 in settlement of the Pollocks' claim for malpractice. A hearing determined that settlement to be reasonable. Thereafter, Fisons settled with the Pollocks

---

[29]*Graybar*, 112 Wn.2d at 853; RCW 7.72.010(4).

[30]*See* Talmadge, *Washington's Product Liability Act*, 5 U. Puget Sound L. Rev. 1, 8 n.39 (1981-1982).

[31]RCW 7.72.010(4); Talmadge, *Washington's Product Liability Act*, 5 U. Puget Sound L. Rev. 1, 10 (1981-1982); *Graybar*, 112 Wn.2d at 850.

and that settlement was also determined to be reasonable. Hence, as a matter of law each party's potential contribution rights available under RCW 4.22.040 were extinguished.[32]

RCW 4.22.060(2) provides in pertinent part:

> A release . . . entered into by a claimant and a person liable discharges that person from all liability for contribution, . . .

After the drug company settled with the Pollocks, the court held a reasonableness hearing and ordered that "Dr. Klicpera's contribution/indemnity claims against Fisons are extinguished pursuant to RCW 4.22.060." WSPIE was acting on behalf of its insured and hence could have been subrogated to the rights of its insured. However, once Fisons settled, Dr. Klicpera's contribution rights for reimbursement for amounts paid to the Pollocks were extinguished. To allow the insurance company to bring a consumer protection action against Fisons for what is in reality contribution or indemnity would be to allow an "end-run" around the tort reform act (RCW 4.22).

As Senator Talmadge, Chairman of the Senate Select Committee on Tort and Product Liability Reform, explained,

> the Act provides that where a party enters into a settlement agreement with the claimant, if the settlement agreement is a reasonable one, all liability on the part of that defendant for contribution and for claims by the claimant is discharged. The senate select committee felt that the process of settlement of lawsuits must be encouraged. The ability of a party entering into a settlement with the claimant to be discharged from all claims, including contribution, was essential to fulfill the policy of encouraging settlement.

Talmadge, *Washington Product Liability Act*, 5 U. Puget Sound L. Rev. 1, 18-19 (1981-1982).

Therefore, neither the doctor, nor the doctor's insurer, is entitled to recover settlement amounts paid to the Pollocks after their contribution/indemnity rights were extinguished.

The trial court did not err when it disallowed WSPIE's Consumer Protection Act claim.

---

[32]*Kirk v. Moe*, 114 Wn.2d 550, 556, 789 P.2d 84 (1990) (a settling defendant is released from all liability, including contribution).

ISSUE FIVE.

CONCLUSION. We hold that the trial court did not err in excluding the testimony of the drug company's sales representative based upon Rule of Evidence 406.

The drug company sought to introduce testimony from its sales representative, Kevin Cobley, that it was his habit to discuss the dangers of theophylline and a particular study which included information about the risks of theophylline when he visited physicians, and, therefore, he must have discussed those risks with Dr. Klicpera. Mr. Cobley did not have any specific memory of talking with Dr. Klicpera about the study. He testified, however, that his usual "habit" was to discuss the subject, and this testimony was sought to be introduced pursuant to ER 406.

ER 406 provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Although the rule does not define "habit", the advisory committee note to Fed. R. Evid. 406 quotes Professor McCormick's description of habitual behavior as "consisting of semi-automatic, almost involuntary and invariabl[y] specific responses to fairly specific stimuli."[33] The comments to our ER 406 state that evidence offered under the rule could, of course, still be excluded if the court determines that the conduct sought to be shown did not reach the level of habit or routine.[34]

Mr. Cobley told the trial court that his presentation to physicians "would go virtually the same way with every physician". In response to that court's question whether he could testify that he did discuss these things with Dr. Klicpera, Mr. Cobley responded "I would say it's highly unlikely that I did not".

---

[33]Comment, ER 406; 5 K. Tegland, Wash. Prac., *Evidence* 459 (3d ed. 1989).

[34]5 K. Tegland, at 459.

Although Mr. Cobley's business notes of November 8, 1984 indicated Dr. Klicpera was "Impressed with Furukawa study . . .",[35] Mr. Cobley also stated that there was merely "some reference" in that study to viral illness and problems with theophylline toxicity.[36] After a discussion with the court, Mr. Cobley admitted he did not have a copy of the study to give Dr. Klicpera on the date that he noted the physician was "impressed" with it.[37] The trial court concluded that Mr. Cobley's behavior did not rise to the level of a habit.

As with most evidentiary questions, determination of admissibility of habit evidence is within the trial court's discretion.[38] Since habit is "semi-automatic, almost involuntary and invariabl[y] specific responses to fairly specific stimuli", we conclude the trial court did not abuse its discretion in holding that Mr. Cobley's conduct did not reach the level of habit and was thus inadmissible.[39]

ISSUE SIX.

CONCLUSION. We hold that the plaintiffs' state law claims were not impliedly preempted by the Federal Food and Drug Administration (FDA) guidelines.

The drug company argues that the doctor's state law remedies are preempted by the Federal Food and Drug Administration's issuance of uniform class labeling guidelines for theophylline. We disagree.

Federal preemption of state law may occur if Congress passes a statute that expressly preempts state law, if

---

[35]Report of Proceedings, at 3363.

[36]Report of Proceedings, at 3366.

[37]Report of Proceedings, at 3374-78.

[38]*Norris v. State*, 46 Wn. App. 822, 733 P.2d 231 (1987); *Maehren v. Seattle*, 92 Wn.2d 480, 599 P.2d 1255 (1979), *cert. denied*, 452 U.S. 938 (1981).

[39]*Compare Meyers v. Meyers*, 5 Wn. App. 829, 491 P.2d 253 (notary's business practice, which she said never varied, was admissible as habit evidence), *aff 'd*, 81 Wn.2d 533, 503 P.2d 59, 59 A.L.R.3d 1318 (1972) *with Meder v. Everest & Jennings, Inc.*, 637 F.2d 1182 (8th Cir. 1981) (on issue of whether police officer's notes were based upon the statements of accident victim, the fact the officer normally spoke to the victims first did not rise to the level of habit under Fed. R. Evid. 406).

Congress preempts state law by occupation of the entire field of regulation or if the state law conflicts with federal law due to impossibility of compliance with state and federal law or when state law acts as an obstacle to the accomplishment of the federal purpose.[40]

There is no allegation here of express preemption,[41] or of any intent to occupy the field. Rather, the drug company argues that preemption should be implied because the state law stands as an obstacle to the accomplishment of the full purposes of the FDA guidelines.

As we recently reiterated, there is a strong presumption against finding preemption in an ambiguous case and the burden of proof is on the party claiming preemption.[42] The presumption against preemption is even stronger with state regulation regarding matters of health and safety.[43] State laws are not superseded by federal law unless that is the clear and manifest purpose of Congress.[44] The defendants here have presented no statutory language or history which supports a conclusion that Congress intended to preempt state law on the subject of pharmaceutical manufacturers' liability under state law. In fact, case law and scholarly comment indicates that the FDA regulations do not have a preemptive effect on state laws.

---

[40]See, e.g., Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 604-05, 115 L. Ed. 2d 532, 111 S. Ct. 2476, 2481-82 (1991).

[41]"We recognize that there are cases decided under FDA regulation where the federal law does preempt state tort law. See Berger v. Personal Prods., Inc., 115 Wn.2d 267, 797 P.2d 1148 (1990), cert. denied, 499 U.S. 961, 113 L. Ed. 2d 649, 111 S. Ct. 1584 (1991). However, those cases involve the express preemptive power of 21 U.S.C. § 360k which applies only when state law claims involve "medical devices" and not prescription drugs. Spychala v. G.D. Searle & Co., 705 F. Supp. 1024, 1029 (D.N.J. 1988).

[42]Inlandboatmen's Union v. Department of Transp., 119 Wn.2d 697, 702, 836 P.2d 823 (1992).

[43]Abbott v. American Cyanamid Co., 844 F.2d 1108, 1112 (4th Cir. 1988), cert. denied, 488 U.S. 908, 102 L. Ed. 2d 248, 109 S. Ct. 260 (1988); Inlandboatmen's, 119 Wn.2d at 705.

[44]Mortier, 501 U.S. at 605.

One recent text summarizes the law on this issue:

**Effect of compliance with FDA regulations**

The Food and Drug Administration (FDA) has promulgated numerous regulations governing the labels and warnings required for drugs. Evidence of compliance with FDA regulations does not necessarily relieve a drug manufacturer of liability for failure to furnish an adequate warning of possible side effects, because the FDA regulations merely set minimum requirements, and does not relieve the manufacturer of the duty to warn of possible side effects or dangers of which it has actual or constructive knowledge as an expert in its field; that is, adherence to government standards does not absolve a drug manufacturer of liability to which it would otherwise be subject.

(Footnotes omitted.) 6 *American Law of Products Liability* § 89:9, at 17 (3d ed. 1987). This conclusion is in accord with the weight of authority.[45]

As the Oregon Supreme Court has pointed out:

A party, commenting to the FDA on its proposed rules, criticized the proposed regulations, arguing that they acted to insulate a manufacturer from liability. The agency responded:

"It is not the intent of FDA to influence civil tort liability of the manufacturer or of the physician. . . ."

44 Fed. Reg. 37,437 (1979).

*Oksenholt v. Lederle Labs.*, 294 Or. 213, 220, 656 P.2d 293, 298 (1982).

---

[45]*See, e.g., Spychala v. G.D. Searle & Co.,* 705 F. Supp. 1024 (D.N.J. 1988) (FDA regulation of prescription drugs may establish minimum standards for design and warnings, but compliance does not necessarily absolve a manufacturer of tort liability). *Accord, Mahr v. G.D. Searle & Co.,* 72 Ill. App. 3d 540, 390 N.E.2d 1214 (1979); *Bristol-Myers Co. v. Gonzales,* 561 S.W.2d 801 (Tex. 1978) (fact that a package insert for a prescription drug has been approved by the FDA does not relieve a drug manufacturer of its obligation to communicate an adequate warning where insert did not adequately warn of potential dangers which were known to officials of manufacturer before inadequacy was known to the FDA); *Abbott v. American Cyanamid Co.,* 844 F.2d at 1112 (preemption does not necessarily follow from federal regulation of prescription drugs); *see Tarallo v. Searle Pharmaceutical, Inc.,* 704 F. Supp. 653, 660 (D.S.C. 1988); *Graham v. Wyeth Labs.,* 666 F. Supp. 1483, 1491 (D. Kan. 1987) (FDA certification is evidence, but not conclusive evidence of a drug manufacturer's reasonableness. Before a court can conclude federal regulations — which traditionally set minimum standards — have preempted the ability of states to protect their citizens through the judicial process, there should be a clear congressional intent), *vacated in part on other grounds,* 851 F.2d 321 (10th Cir. 1988); Comment, *Pharmaceutical Product Liability,* 42 Am. Univ. L. Rev. 199 (1992).

The Federal Food, Drug, and Cosmetic Act does not create any private right of action.[46] Hence, if FDA regulations preempt all state law, arguably no cause of action would exist for a violation of the manufacturer's duty to warn physicians of dangers of prescription drugs.[47]

Given the strong presumption against federal preemption of state laws regarding health and safety issues,[48] it is clear that the Federal FDA regulations do not have a preemptive effect on state law.

ISSUE SEVEN.

CONCLUSION. The trial court did not err in refusing to grant a new trial or to reduce the damage award because of the amount of damages awarded by the jury.

 The standards for an appellate court overturning a jury's damage award are well settled in Washington.[49] In our recent decision in *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 268-69, 840 P.2d 860 (1992), the principles which govern review by an appellate court of a verdict claimed to be excessive as set forth in *Bingaman v. Grays Harbor Comm'ty Hosp.*, 103 Wn.2d 831, 835-37, 699 P.2d 1230 (1985) were reiterated:

> The determination of the amount of damages, particularly in actions of this nature, is primarily and peculiarly within the province of the jury, under proper instructions, and the courts should be and are reluctant to interfere with the conclusion of a jury when fairly made.
> . . . Because of the favored position of the trial court, it is accorded room for the exercise of its sound discretion in such situations. The trial court sees and hears the witnesses, jurors, parties, counsel and bystanders; it can evaluate at first hand such things as candor, sincerity, demeanor, intelligence and any surrounding incidents. The appellate court,

---

[46]*See, e.g.*, *Raye v. Medtronic Corp.*, 696 F. Supp. 1273, 1274 (D. Minn. 1988) and cases cited therein.

[47]*See Abbott*, 844 F.2d at 1112 (the presumption against preemption is even stronger against preemption of state remedies, like tort recoveries, when no federal remedy exists).

[48]*Tarallo*, 704 F. Supp. at 658; *Inlandboatmen's*, 119 Wn.2d at 705.

[49]RCW 4.76.030; CR 59(a)(5), (7).

on the other hand, is tied to the written record and partly for that reason rarely exercises this power.

An appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.

. . .

Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity as to make it unmistakable. . . .

(Footnotes omitted.) *Washburn*, 120 Wn.2d at 268-69 (quoting *Bingaman*).

 The appellate court does not engage in exactly the same review as the trial court because deference and weight are also given to the trial court's discretion in denying a new trial on a claim of excessive damages. The verdict is strengthened by denial of a new trial by the trial court.[50] While either the trial court or an appellate court has the power to reduce an award or order a new trial based on excessive damages,[51] "appellate review is most narrow and restrained" and the appellate court "rarely exercises this power".[52]

The drug company relies upon *Himango v. Prime Time Broadcasting, Inc.*, 37 Wn. App. 259, 680 P.2d 432, *review denied*, 102 Wn.2d 1004 (1984) in which the Court of Appeals concluded that the jury's belief that the plaintiff's reputation had suffered had to have been based on speculation. However, in *Himango*, the appellate court was deciding if the trial court properly reduced the jury's verdict and not, as here, whether the appellate court should reduce a verdict despite the trial court's refusal to do so.

Bearing the very restrictive appellate review standard in mind, our inquiry is whether the award is outside the range of substantial evidence in the record, shocks the conscience of the court or clearly appears to have been arrived at as a result of passion or prejudice.

---

[50]*Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 271, 840 P.2d 860 (1992).

[51]*Malstrom v. Kalland*, 62 Wn.2d 732, 738-39, 384 P.2d 613 (1963).

[52]*Washburn*, 120 Wn.2d at 269 (quoting *Bingaman*, 103 Wn.2d at 835).

 ██ The rule in Washington on the question of sufficiency of the evidence to prove damages is that: " '[t]he fact of loss must be established with sufficient certainty to provide a reasonable basis for estimating that loss.' "[53] The drug company asks this court to make comparisons between this case and damage awards in other cases. In *Washburn*, we emphatically disallowed such comparisons;[54] the focus, rather, must be on the particular injuries in this case.

The evidence the jury heard regarding reputation damage was Dr. Klicpera's own opinion as to such loss and a statement by the trial court that there had been newspaper accounts reporting Dr. Klicpera's alleged medical malpractice. Dr. Klicpera essentially testified that he thought there was certainly a loss to his reputation in the community, and that other physicians had been ignoring him and that he no longer enjoyed his practice and had taken steps to find administrative work.

Pursuant to the drug company's request, the trial court initially ruled that the newspaper articles regarding Dr. Klicpera's incompetence were inadmissible. However, after expressing concern that Dr. Klicpera's reputation damages would not be provable without reference to the press articles, the court subsequently read the following statement to the jury:

> Before this trial started, the press disseminated the fact in the community that Dr. Klicpera had been sued for medical malpractice on behalf of Jennifer Pollock and her parents. This information was supplied to the press by the attorneys representing the Pollocks.

This statement resulted from the fact that there was a front page article in the physician's hometown newspaper which indicated that Dr. Klicpera knew enough about the

---

[53]*Haner v. Quincy Farm Chems., Inc.*, 97 Wn.2d 753, 757, 649 P.2d 828 (1982) (quoting *Wilson v. Brand S Corp.*, 27 Wn. App. 743, 747, 621 P.2d 748 (1980)). *See also Lewis River Golf, Inc. v. O.M. Scott & Sons*, 120 Wn.2d 712, 717, 845 P.2d 987 (1993) (doctrine that damages must be proved with reasonable certainty is concerned more with the fact of damage than the extent or amount of damages).

[54]*Washburn*, 120 Wn.2d at 266-68.

drug to use it safely but failed to apply that knowledge, and an article on the front page of the Seattle Post-Intelligencer with a statement from the drug company's representative saying the settlement was made with the Pollocks on the possibility that the company could become a deep pocket in a jury award based on the physician's negligence and that the child's injuries were the result of mistreatment by the physician who overdosed the child. According to unrefuted representations made to the trial court, articles also were published in Spokane, Chicago and Los Angeles.

Damages for loss of professional reputation are not the type of damages which can be proved with mathematical certainty and are usually best left as a question of fact for the jury. Given the narrow standard of review and the deference accorded to both the jury's discretion, and the trial court's refusal to overturn the award, we conclude that the admitted evidence was sufficient to sustain the jury's award for damages to Dr. Klicpera's reputation.

There was, however, one portion of damages which was awarded under the Consumer Protection Act which must be disallowed. The jury awarded $150,000 for income loss due to lost consultations; the trial court reduced that award to $2,250. The problem with this award is that it conflicts with the trial court's conclusion that damages based upon income lost due to time spent for trial were not recoverable. There is no challenge to this conclusion.

The physician testified that because of his unavailability due to this trial, he missed some consultations he otherwise would have done; these consultations were all foregone because of time spent in or preparing for trial. The trial court had disallowed damages based upon income lost due to time spent for the lawsuit. The trial court recognized that "all of the losses of consultation . . . were because he was unavailable" due to trial matters. However, the trial court later reduced the consultation award from $150,000 to $2,250. In light of the trial court's unchallenged conclusion that damages for time lost due to trial preparation were not recoverable, we conclude

there was no evidence to support an award for loss of consultations.

The drug company also argues that the award was based upon obvious passion or prejudice. It bases this partly on certain portions of the plaintiffs' attorneys' closing argument. They argue that the court order, stating that alleged litigation fraud and alleged discovery violations should not be presented to the jury, was violated in closing argument. However, the court order, while disallowing reference to discovery disputes, allowed evidence regarding whether certain documents were known to plaintiffs prior to settlement and whether experts had access to the discovery documents when opinions were expressed. While the timing of witnesses' knowledge may have implied "litigation fraud" or discovery violations, such testimony (introduced without objection) and argument referring to it were not in violation of the trial court's order.

In closing argument, the physician's attorney drew a comparison between the number of theophylline side effects reported in a Group Health study (which had been described to the jury during trial) to the number of people who would be shot per 10,000 people if a terrorist were to shoot a given number of times inside Husky Stadium. The drug company now argues that this analogy was so misleading that this court should overturn the jury's decision because it was based on passion or prejudice. This argument, however, was generally based upon the statistics in the study and upon numbers testified to by Fisons' own expert. Most importantly, there was no contemporaneous objection to this analogy. Any perceived inaccuracies in the analogy drawn by plaintiffs' counsel could have been drawn to the attention of the trial court which could have made a curative instruction if necessary.

Even when portions of closing argument are improper or inaccurate, failure to make contemporaneous objections usually waives any error unless the argument was so flagrant and prejudicial as not to be subject to a curative

instruction.[55] This is especially true when the trial court instructs the jury that arguments are not evidence and that argument not supported by evidence is to be disregarded.[56] In this case, the jury was so instructed and with regard to the debatably improper arguments no contemporaneous objections were made.

■ In order to overturn a jury's verdict based on passion or prejudice, it must be of such manifest clarity as to make it unmistakable.[57] We do not find such evidence here and decline to disturb the jury's award of damages for loss of reputation.

Since we have concluded that the physician's claims of pain and suffering are not compensable, we do not address the issue of sufficiency of the evidence to support the jury's pain and suffering award of $2,137,500.

ISSUE EIGHT.

CONCLUSION. The trial court did not abuse its discretion in its calculation of the attorneys' fees awarded pursuant to the Consumer Protection Act.

The drug company argues that the trial court erred in (1) calculating the attorneys' fees based upon an "enhanced hourly rate" and (2) by using a 1.5 multiplier of the lodestar based upon quality and contingency.

■ Attorneys' fees available to a successful Consumer Protection Act plaintiff under RCW 19.86.090 are calculated as follows: (1) establishing a "lodestar" fee by multiplying a reasonable hourly rate by the number of hours reasonably expended on theories necessary to establish the elements of a Consumer Protection Act cause of action; and (2) adjusting that lodestar up or down based upon the contingent nature of success (risk) and, in exceptional circumstances, based also on the quality of work performed.[58] The burden of justi-

---

[55]*Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 532, 554 P.2d 1041 (1976); *Nelson v. Martinson*, 52 Wn.2d 684, 689, 328 P.2d 703 (1958).

[56]*E.g., Jones v. Hogan*, 56 Wn.2d 23, 31-32, 351 P.2d 153 (1960).

[57]*James v. Robeck*, 79 Wn.2d 864, 870, 490 P.2d 878 (1971); *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 269, 840 P.2d 860 (1992).

[58]*Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 593-99, 675 P.2d 193 (1983); *Travis v. Washington Horse Breeders Ass'n*, 111 Wn.2d 396, 409, 759 P.2d 418 (1988); *see also Scott Fetzer Co. v. Weeks*, 114 Wn.2d 109, 786 P.2d 265 (1990).

fying any deviation from the lodestar rests on the party proposing such an alteration.[59]

Attorneys seeking fees must provide reasonable documentation of work performed to calculate the number of hours and when attorneys have "an established rate for billing clients", that rate will likely be considered as reasonable.[60]

■ A trial court's fee award will not be overturned absent an abuse of discretion.[61] Whether attorneys' fees are reasonable is a factual inquiry depending on the circumstances of a given case and the trial court is accorded broad discretion in fixing the amount of attorneys' fees.[62]

In this case, the trial court established the hourly fee by averaging the reduced rate charged by the attorneys in medical malpractice defense cases with the hourly rate charged in their other practice. There is no convincing showing that the trial court abused its discretion in arriving at the hourly fee in this manner. That hourly fee was multiplied by 50 percent of the hours expended during the entire case, the amount the trial court decided was attributable to theories necessary to prove the Consumer Protection Act claim. We find no abuse of discretion in this conclusion and decline to disturb the trial court's calculation of the "lodestar" fee.

The trial court then multiplied the lodestar amount by 1.5 based upon the fact that part of the fees were contingent upon success, and on the quality of the work performed by plaintiffs' attorneys in a difficult case.

■ Quality can be a valid enhancer when the representation is unusually good, taking into account the level of skill normally expected of an attorney commanding the hourly rate used to compute the "lodestar".[63] A multiplier for "quality" is seldom sanctioned by this court because quality of a

---

[59]*Bowers*, 100 Wn.2d at 598 (quoting *Copeland v. Marshall*, 641 F.2d 880, 892 (D.C. Cir. 1980)).

[60]*Bowers*, 100 Wn.2d at 597.

[61]*Travis*, 111 Wn.2d at 410; *Bowers*, 100 Wn.2d at 595.

[62]*Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 169, 795 P.2d 1143 (1990).

[63]*Bowers*, 100 Wn.2d at 599.

lawyer's work is usually reflected in the establishment of the lawyer's hourly rate.[64] However, in this case exceptional quality was not the only factor which caused the trial court to enhance the lodestar.

This case was tried partially on a guaranteed fee arrangement and the remainder on a contingency agreement. Whether the difficult and novel nature of this case combined with what the court found to be high quality work and partial contingency supports the use of a 1.5 multiplier is a close question. The trial court found that the likelihood of success was low because Dr. Klicpera's attorneys did not initially have access to what turned out to be the determinative "smoking gun" documents. The 50 percent premium which reflects the partially contingent nature of the representation together with the unusually high quality of work performed in this novel case does not appear to us from the record to be an abuse of the trial court's discretion. This being a close question, we defer to the trial court's discretion and sustain its calculation of attorneys' fees.

■ Attorneys' fees on appeal are recoverable under the Consumer Protection Act.[65] Because of the factfinding required to support such fees, remand to the trial court for determination of reasonable fees on appeal is appropriate in this case.[66]

ISSUE NINE.

CONCLUSION. The trial court applied an erroneous legal standard when ruling on the motion for sanctions for discovery abuse and erred when it refused to sanction the drug company and/or its attorneys for violation of CR 26(g).

The doctor and his insurer, Washington State Physicians Insurance & Exchange Association (hereinafter referred to

---

[64]*Travis*, 111 Wn.2d at 411; Washington State Bar Ass'n, *Consumer Protection, Antitrust and Unfair Business Practices Law Developments* 185 (2d ed. 1988) (hereinafter *Consumer Protection*).

[65]*Bowers*, 100 Wn.2d at 602.

[66]*Consumer Protection*, at 177-78; RAP 18.1(i).

collectively as "the doctor"), asked the trial court to sanction the drug company and its lawyers for discovery abuse. This request was based on the fact that at least two documents crucial to the doctor's defense as well as to the injured child's case were not discovered until March of 1990 — more than 1 year after the doctor had settled with the child, nearly 4 years after the complaint was filed and approximately 1 month before the scheduled trial date. The two documents, dubbed the "smoking guns" by the doctor, show that the drug company knew about, and in fact had warned selected physicians about, the dangers of theophylline toxicity in children with viral infections at least as early as June 1981, 4 years before Jennifer Pollock was injured.

Although interrogatories and requests for production should have led to the discovery of the "smoking gun" documents, their existence was not revealed to the doctor until one of them was anonymously delivered to his attorneys.

A motion for sanctions based on discovery abuse was heard first by a special discovery master on March 28, 1990, before the child's case was settled. The special master ruled that he could not find "on the basis of this record that there was an *intentional* withholding of this document." (Italics ours.) Clerk's Papers, at 9693. The special master then turned to what he determined was the more relevant issue, additional and full discovery of other theophylline-related documents in the drug company's possession. The special master ordered the drug company's attorneys to turn over any immediately available documents concerning theophylline to attorneys for the child and the doctor by noon the next day and to review the remainder of the drug company's files and produce other relevant documents at the end of 2 weeks. The next day, the second "smoking gun", a 1985 internal memorandum describing theophylline toxicity in children, was delivered along with about 10,000 other documents.

Although other documents were relevant to the case, the two smoking gun documents were the most important. The first, a letter, dated June 30, 1981, discussed an article that

contained a study confirming reports "of life threatening theophylline toxicity when pediatric asthmatics . . . contract viral infections." Exhibit 3. The second, an interoffice memorandum, dated July 10, 1985, talks of an "epidemic" of theophylline toxicity and of "a dramatic increase in reports of serious toxicity to theophylline." Exhibit 7.

Both documents contradicted the position taken by the drug company in the litigation, namely, that it did not know that theophylline-based medications were potentially dangerous when given to children with viral infections.

After the 1985 memorandum was discovered and still prior to trial, the special master's denial of the sanctions motion was appealed and affirmed, without specific findings, by a judge of the Superior Court (Judge Knight), who essentially deferred to the special master.

The motion for sanctions was renewed and heard by another judge of the Superior Court, the trial judge (Judge French), at the close of trial. The trial court declined to impose sanctions, deferring to the earlier decisions of the special master and Judge Knight. The doctor then appealed the denial of his sanctions motion directly to this court.

The standard of review to be applied to sanctions decisions under CR 11 and CR 26(g) has not yet been specifically articulated by this court.[67]

The doctor urges us to review the sanctions decision de novo. However, decisions either denying or granting sanctions, under CR 11 or for discovery abuse, are generally reviewed for abuse of discretion.[68] We hold that the proper standard to apply in reviewing sanctions decisions is the abuse of discretion standard.

---

[67]*See Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 218, 829 P.2d 1099 (1992) (reviewing the imposition of sanctions under CR 11 but declining, in that case, to establish a standard of review).

[68]*See, e.g., Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 L. Ed. 2d 359, 110 S. Ct. 2447 (1990) (appeal from the imposition of Fed. R. Civ. P. 11, which is substantially similar to Washington's CR 11); *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 49 L. Ed. 2d 747, 96 S. Ct.

The abuse of discretion standard again recognizes that deference is owed to the judicial actor who is "better positioned than another to decide the issue in question.' " *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 403, 110 L. Ed. 2d 359, 110 S. Ct. 2447 (1990) (quoting *Miller v. Fenton*, 474 U.S. 104, 114, 88 L. Ed. 2d 405, 106 S. Ct. 445 (1985)). Further, the sanction rules are "designed to confer wide latitude and discretion upon the trial judge to determine what sanctions are proper in a given case and to 'reduce the reluctance of courts to impose sanctions'. . . . If a review de novo was the proper standard of review, it could thwart these purposes; it could also have a chilling effect on the trial court's willingness to impose . . . sanctions." *Cooper v. Viking Ventures*, 53 Wn. App. 739, 742-43, 770 P.2d 659 (1989) (quoting Fed. R. Civ. P. 11 advisory committee note, 97 F.R.D. 198 (1983)).

A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds.[69] A trial court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law.[70]

The doctor asked that sanctions be awarded pursuant to CR 11, CR 26(g), CR 37(d), or the inherent power of the court. CR 11 sanctions are not appropriate where, as

---

2778 (1976) (abuse of discretion standard applied in reviewing the imposition of sanctions for discovery abuse); *Snedigar v. Hoddersen*, 114 Wn.2d 153, 169, 786 P.2d 781 (1990) (sanctions imposed for failure to comply with discovery order would be reviewed for abuse of discretion). Furthermore, each of the three divisions of this state's Court of Appeals has determined that the abuse of discretion standard should be applied when reviewing sanctions imposed for violation of CR 11. *See, e.g., In re Guardianship of Lasky*, 54 Wn. App. 841, 852, 776 P.2d 695 (1989) (Division One); *Lee v. Columbian, Inc.*, 64 Wn. App. 534, 539, 826 P.2d 217 (1991) (Division Two); *Cooper v. Viking Ventures*, 53 Wn. App. 739, 742, 770 P.2d 659 (1989) (Division Three).

[69]*Holbrook v. Weyerhaeuser Co.*, 118 Wn.2d 306, 315, 822 P.2d 271 (1992); *Watson v. Maier*, 64 Wn. App. 889, 896, 827 P.2d 311, *review denied*, 120 Wn.2d 1015 (1992).

[70]*See Cooter & Gell*, 496 U.S. at 405.

here, other court rules more properly apply.[71] Similarly, the sanctions provisions of CR 37 do not apply where, as here, the more specific sanction rule better fits the situation. Furthermore, the inherent power of the court should not be resorted to where rules adequately address the problem.[72] Because CR 26(g), the discovery sanctions rule, was adopted to specifically address the type of conduct involved here, it, rather than CR 11, CR 37 or the inherent power of the court, is applicable in the present case.

CR 26(g) was added to our civil rules in 1985; it provides as follows:

> Every request for discovery or response or objection thereto made by a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign the request, response, or objection and state his address. The signature of the attorney or party constitutes a certification that he has read the request, response, or objection, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry it is: (1) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation. . . .
>
> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.

---

[71]*Bryant v. Joseph Tree, Inc.*, 119 Wn.2d at 223; *Clipse v. State*, 61 Wn. App. 94, 97, 808 P.2d 777 (1991) (noting that the discovery sanction rule, CR 26(g), rather than CR 11, governs discovery disclosures).

[72]Where conduct occurring during the course of litigation can be adequately sanctioned under court rules, a court should ordinarily rely on the rules rather than the inherent power of the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 115 L. Ed. 2d 27, 111 S. Ct. 2123, 2136 (1991).

██ ██ CR 26(g) has not yet been interpreted by this court. The rule parallels Fed. R. Civ. P. 26(g) (Rule 26(g)) and, like its federal counterpart and like CR 11, CR 26(g) is aimed at reducing delaying tactics, procedural harassment and mounting legal costs.[73] Such practices "tend to impose unjustified burdens on other parties, frustrate those who seek to vindicate their rights in the courts, obstruct the judicial process, and bring the civil justice system into disrepute." Schwarzer, *Sanctions Under the New Federal Rule 11 — A Closer Look*, 104 F.R.D. 181, 182 (1985) (hereinafter Schwarzer).

Because it is essentially identical to Rule 26(g), this court may look to federal court decisions interpreting that rule for guidance in construing CR 26(g).[74] In turn, federal courts analyzing the Rule 26 sanctions provision look to interpretations of Fed. R. Civ. P. 11.[75] The federal advisory committee notes describe the discovery process and problems that led to the enactment of Rule 26(g) as follows:

> Excessive discovery and evasion or resistance to reasonable discovery requests pose significant problems. . . .
> The purpose of discovery is to provide a mechanism for making relevant information available to the litigants. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495 (1947). Thus the spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues by overuse of discovery or unnecessary use of defensive weapons or evasive responses. All of this results in excessively costly and time-consuming activities that are disproportionate to the nature of the case, the amount involved, or the issues or values at stake.
> . . .

---

[73]*Cf.* 3A L. Orland & K. Tegland, Wash. Prac., *Rules Practice* 215 (4th ed. 1992) (discussing CR 11).

[74]*See Bryant v. Joseph Tree, Inc.*, 119 Wn.2d at 218-19; *Miller v. Badgley*, 51 Wn. App. 285, 300, 753 P.2d 530, *review denied*, 111 Wn.2d 1007 (1988).

[75]*Apex Oil Co. v. Belcher Co. of New York, Inc.*, 855 F.2d 1009, 1015 (2d Cir. 1988); *Insurance Benefit Adm'rs, Inc. v. Martin*, 871 F.2d 1354, 1360 (7th Cir. 1989).

. . . Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. In addition, *Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions.* . . . The term "response" includes answers to interrogatories and to requests to admit as well as responses to production requests.

. . .

Concern about discovery abuse has led to widespread recognition that there is a need for more aggressive judicial control and supervision. Sanctions to deter discovery abuse would be more effective if they were diligently applied "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." . . . *Thus the premise of Rule 26(g) is that imposing sanctions on attorneys who fail to meet the rule's standards will significantly reduce abuse by imposing disadvantages therefor.*

(Citations omitted. Italics ours.) *Amendments to the Federal Rules of Civil Procedure* advisory committee note, 97 F.R.D. 166, 216-19 (1983).

The concept that a spirit of cooperation and forthrightness during the discovery process is necessary for the proper functioning of modern trials is reflected in decisions of our Court of Appeals. In *Gammon v. Clark Equip. Co.*, 38 Wn. App. 274, 686 P.2d 1102 (1984), *aff'd*, 104 Wn.2d 613, 707 P.2d 685 (1985), the Court of Appeals held that a new trial should have been ordered because of discovery abuse by the defendant. Then Court of Appeals Judge Barbara Durham wrote for the court:

The Supreme Court has noted that the aim of the liberal federal discovery rules is to "make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." The availability of liberal discovery means that civil trials

no longer need be carried on in the dark. The way is now clear . . . for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

This system obviously cannot succeed without the full cooperation of the parties. Accordingly, the drafters wisely included a provision authorizing the trial court to impose sanctions for unjustified or unexplained resistance to discovery.

(Citations omitted.) *Gammon*, 38 Wn. App. at 280.

It was after *Gammon* that this court adopted CR 26(g) in order to provide a deterrent to discovery abuses as well as an impetus for candor and reason in the discovery phase of litigation.

It is with these purposes in mind, that we now articulate the standard to be applied by trial courts which are asked to impose sanctions for discovery abuse.

On its face, Rule 26(g) requires an attorney signing a discovery response to certify that the attorney has read the response and that after a reasonable inquiry believes it is (1) consistent with the discovery rules and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; (2) not interposed for any improper purpose such as to harass or cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had, the amount in controversy, and the importance of the issues at stake in the litigation.

Whether an attorney has made a reasonable inquiry is to be judged by an objective standard.[76] Subjective belief or good faith alone no longer shields an attorney from sanctions under the rules.[77]

In determining whether an attorney has complied with the rule, the court should consider all of the surrounding circumstances, the importance of the evidence to its proponent, and the ability of the opposing party to formulate a response or to comply with the request.[78]

---

[76]*Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 220, 829 P.2d 1099 (1992); *Rhinehart v. Seattle Times, Inc.*, 59 Wn. App. 332, 341, 798 P.2d 1155 (1990).

[77]*Miller v. Badgley*, 51 Wn. App. at 299-300. A proposed amendment to CR 11 would insert an intent requirement. 120 Wn.2d xxix (Proposed Rules of Court, Jan. 6, 1993). No similar amendment to CR 26(g) is currently pending.

[78]*Thibeault v. Square D Co.*, 960 F.2d 239, 246 (1st Cir. 1992). *See also Bryant v. Joseph Tree, Inc.*, 119 Wn.2d at 220-21; G. Joseph, *Sanctions: The Federal Law of Litigation Abuse* 484-91 (1989).

The responses must be consistent with the letter, spirit and purpose of the rules. To be consistent with CR 33, an interrogatory must be "answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer." CR 33(a) (part). A response to a request for production "shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for objection shall be stated. If objection is made to part of an item or category, the part shall be specified." CR 34(b) (part).

In applying the rules to the facts of the present case, the trial court should have asked whether the attorneys' certifications to the responses to the interrogatories and requests for production were made after reasonable inquiry *and* (1) were consistent with the rules, (2) were not interposed for any improper purpose and (3) were not unreasonable or unduly burdensome or expensive. The trial court did not have the benefit of our decision to guide it and it did not apply this standard in this case.

Instead, the trial court considered the opinions of attorneys and others as to whether sanctions should be imposed. This was error. Legal opinions on the ultimate *legal* issue before the court are not properly considered under the guise of expert testimony.[79] It is the responsibility of the court deciding a sanction motion to interpret and apply the law.

The trial court then denied sanctions, in part because: (1) The evidence did not support a finding that the drug company *intentionally* misfiled documents to avoid discovery; (2) neither the doctor nor the child had formally moved for a definition of "product" and neither had moved to compel production of documents or answers before requesting sanctions; (3) the conduct of the drug company and its counsel

---

[79]ER 702; Comment, ER 704; 5A K. Tegland, Wash. Prac., *Evidence* § 309, at 479 (3d ed. 1989); *Orion Corp. v. State*, 103 Wn.2d 441, 461, 693 P.2d 1369 (1985); *Hiskey v. Seattle*, 44 Wn. App. 110, 113, 720 P.2d 867, *review denied*, 107 Wn.2d 1001 (1986).

was consistent with the customary and accepted litigation practices of the bar of Snohomish County and of this state; and (4) the doctor failed to meet his burden of proving that the "evidence of discovery abuse is so clear that reasonable minds could not differ on the appropriateness of sanctions."[80]

The trial court erred in concluding as it did. As stated above, intent need not be shown before sanctions are mandated. A motion to compel compliance with the rules is not a prerequisite to a sanctions motion. Conduct is to be measured against the spirit and purpose of the rules, not against the standard of practice of the local bar. Furthermore, the burden placed on the doctor by the trial court in this regard was greater than that mandated under the rule.

 Additionally, we agree with the doctor's claim that many of the findings of fact entered by the trial court are, instead, erroneous conclusions of law or are not supported by the evidence. For example, the trial court implicitly found in finding of fact 7, and then again in finding of fact 14b, that the "product scope" had been defined by the plaintiffs early in the litigation. The record does not support this finding. In finding of fact 14c the trial court stated that the doctor had been put on notice by the drug company's discovery responses that production of documents "would be limited to responsive documents from Somophyllin Oral Liquid *files*". (Italics ours.)[81] There is no evidence in the record to support this finding and while findings of fact which are supported by substantial evidence will not be disturbed on appeal, unsupported findings cannot stand.[82]

 A remand for a determination as to whether sanctions are warranted would be appropriate but is not necessary.[83] Where, as here, the trial judge has applied the wrong

---

[80]Report of Proceedings, at 4523.

[81]Clerk's Papers, at 7653.

[82]*See Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987).

[83]*Bryant v. Joseph Tree, Inc.*, 119 Wn.2d at 222.

legal standard to evidence consisting entirely of written documents and argument of counsel, an appellate court may independently review the evidence to determine whether a violation of the certification rule occurred.[84] If a violation is found, as it is here, then sanctions are mandated,[85] but in fairness to the attorneys and parties, a remand is required for a hearing on the appropriate sanctions required and against whom they should be imposed.

We now measure the conduct of the drug company and its attorneys against the standard set forth in the rule.

▮▮▮ The drug company was persistent in its resistance to discovery requests.[86] Fair and reasoned resistance to discovery is not sanctionable. Rather it is the misleading nature of the drug company's responses that is contrary to the purposes of discovery[87] and which is most damaging to the fairness of the litigation process.

---

[84]*Bryant v. Joseph Tree, Inc.*, 119 Wn.2d at 222.

[85]*Clipse v. State*, 61 Wn. App. 94, 99, 808 P.2d 777 (1991).

[86]For example, the drug company's response to the following interrogatory propounded by the doctor demonstrates the resistance to comply with discovery. Although we do not condone this kind of answer, this answer, *alone*, would not warrant sanctions as it does raise some legitimate objections. The doctor's simple request, and the answer thereto, are as follows:

INTERROGATORY NO. 2: Can Theophylline cause brain damage in humans? ANSWER: *See* general objections [set forth in two pages] attached hereto as Exhibit A and incorporated herein by reference. This interrogatory calls for an expert opinion beyond the scope of Civil Rule 26(b)(4), and is, in any event, premature. Furthermore, this interrogatory appears to call for an opinion based on medical knowledge after January 18, 1986, whereas the relevant time frame is on or before January 18, 1986. In addition, this interrogatory is not reasonably calculated to lead to discovery of admissible evidence under CR 26(b)(1). This interrogatory is also vague, ambiguous and overbroad. For example, the term "cause" is vague and ambiguous in that it does not specify whether it includes indirect, as opposed to direct, causes. The term "brain damage" is similarly vague and ambiguous and is overbroad as to time and scope. For example, it is unclear whether the term "brain" includes the entire central nervous system; it is further unclear whether the term "brain damage" includes temporary as well as permanent changes.
Clerk's Papers, at 4209-10.

[87]*See, e.g., Jerome v. Pardis*, 240 Mont. 187, 783 P.2d 919 (1989) (holding responses to discovery that attempt to mislead by concealing information which

The specific instances alleged to be sanctionable in this case involve misleading or "non" responses to a number of requests which the doctor claims should have produced the smoking gun documents themselves or a way to discover the information they contained. The two smoking gun documents reportedly were contained in files which related to Intal, a cromolyn sodium product, which was manufactured by Fisons and which competed with Somophyllin. The manager of medical communications had a thorough collection of articles, materials and other documents relating to the dangers of theophylline and used the information from those materials to market Intal, as an alternative to Somophyllin Oral Liquid. The drug company avoided production of these theophylline-related materials, and avoided identifying the manager of medical communications as a person with information about the dangers of theophylline, by giving evasive or misleading responses to interrogatories and requests for production.

The following is but a sampling of the discovery between the parties.

The first discovery documents directed to the drug company were prepared by the child's attorney and were dated September 26, 1986. The interrogatories contained a short definition section stating in part:

> The term "the product" as used hereinafter in these interrogatories shall mean the product which is claimed to have caused injury or damage to JENNIFER MARIE POLLOCK as alleged in pleadings filed on her behalf, namely, to wit: "Somophyllin" oral liquid.

Clerk's Papers, at 4103.

These first interrogatories requested information about "the product" which is manufactured by the drug company, Fisons, as well as about theophylline, a drug entity which is the primary ingredient of the drug company's product Somophyllin Oral Liquid. The interrogatory regarding theophylline was answered by the drug company, as were the interrogatories about "the product".

---

is material to the other party's case are not consistent with the rules and the "spirit of discovery").

Somophyllin and its primary ingredient, theophylline, were not distinguished in discussions between the attorneys or in drug company literature. The printed package insert for Somophyllin Oral Liquid (exhibit 93) and marketing brochures refer to the names Somophyllin and theophylline interchangeably. One marketing brochure states:

> Theophylline
> Theophylline
> Theophylline
> Theophylline
> Theophylline
> Theophylline
> Theophylline
> Theophylline
> Theophylline
> The *one* name to remember . . .
> Somophyllin.

Exhibit 111.

The drug company's responses to discovery requests contained the following general objection:

> *Requests Regarding Fisons Products Other Than Somophyllin Oral Liquid.* Fisons objects to all discovery requests regarding Fisons products other than Somophyllin Oral Liquid as overly broad, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence.

See, *e.g.*, Clerk's Papers, at 7399.

Theophylline is not a Fisons "product". Furthermore, because theophylline is the primary ingredient in Somophyllin Oral Liquid, any document focusing on theophylline would, necessarily, be one *regarding* Somophyllin Oral Liquid.

In November 1986 the doctor served his first requests for production on the drug company. Four requests were made. Three asked for documents concerning Somophyllin. Request 3 stated:

> 3. Produce genuine copies of any letters sent by your company to physicians concerning theophylline toxicity in children.

The drug company's response was:

> Such letters, *if any*, regarding Somophyllin Oral Liquid will be produced at a reasonable time and place convenient to Fisons and its counsel of record.

Clerk's Papers, at 8458.

Had the request, as written, been complied with, the first smoking gun letter (exhibit 3) would have been disclosed early in the litigation. That June 30, 1981 letter concerned theophylline toxicity in children; it was sent by the drug company to physicians.

The child's first requests for production, and the responses thereto, included the following:

REQUEST FOR PRODUCTION NO. 12: All documents pertaining to any warning letters including "Dear Doctor letters" or warning correspondence to the medical professions regarding the use of the drug Somophyllin Oral Liquid.

RESPONSE: Fisons objects to this request as overbroad in time and scope for the reasons identified in response to request number 2, hereby incorporated by reference. *Without waiver of these objections and subject to these limitations, Fisons will produce documents responsive to this request* at plaintiffs' expense at a mutually agreeable time at Fisons' headquarters.

REQUEST FOR PRODUCTION NO. 13: All documents of any clinical investigators who at any time stated or recommended to the defendant that the use of the drug Somophyllin Oral Liquid might prove dangerous.

RESPONSE: Fisons objects to this request as overbroad in time and scope for the reasons identified in response to request number 2 hereby incorporated by reference. Fisons further objects to this request as calling for materials not within Fisons' possession, custody or control. Fisons further objects to this request to the extent it calls for expert disclosures beyond the scope of CR 26(b)(4) or which may be protected by the work-product and/or attorney-client privilege. *Without waiver of these objections and subject to these limitations, Fisons will produce documents responsive to this interrogatory* at plaintiffs' expense at a mutually agreeable time at Fisons' headquarters.

(Italics ours.) Clerk's Papers, at 6329-30.

The doctor further requested:

Request for Production No. 4: Please produce copies of any and all seminar materials, regardless of their source, in Fisons' possession on or before January 16, 1986 regarding asthma, bronchopulmonary dysplasia, theophylline and/or allergy.

Response: Fisons objects to this discovery request as overbroad, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence *to the extent it seeks seminar materials regarding subjects other than theophylline.* Without waiving these objections, Fisons answers as follows:

> *Fisons has no documents regarding theophylline* and otherwise responsive to this discovery request.

(Some italics ours.) Clerk's Papers, at 3868.

These requests, and others of a similar tenor, should have led to the production of the smoking gun documents.

When the child or the doctor attempted to see information from the files of other products, the drug company objected. For example:

> Request for Production No. 1: All documents contained in all files from the regulating department, marketing department, drug surveillance department, pharmaceutical development department, product manager department and the medical departments regarding all cromolyn [Intal] products of Fisons Corporation. Regarding this request for production all documents should include from inception of file to the present.
>
> Answer: Defendant Fisons objects to this discovery request as not reasonably calculated to lead to the discovery of admissible evidence, as overbroad in time, and as incredibly burdensome and harassing. This discovery request encompasses approximately *eighty-five* percent of *all* documents in the subject files and departments — millions of pages of documents. *Neither cromolyn (which should be referred to as cromolyn sodium), nor any cromolyn product, nor the properties or efficacy of cromolyn is at issue in this litigation.* Furthermore, Fisons objects to this discovery request as calling for the production of extremely sensitive trade secret and proprietary material.

(Some italics ours.) Clerk's Papers, at 4124.

To requests asking for correspondence, memoranda, articles and other documents "concerning", "regarding" or "covering" Somophyllin Oral Liquid, the drug company generally objected to the requests and then stated

> Without waiver of these objects and subject to these limitations, Fisons will produce documents responsive to this request at plaintiffs' expense at a mutually agreeable time at Fisons' headquarters.

See, *e.g.*, Clerk's Papers, at 7240-55.

In support of the drug company's motion for a protective order, the drug company's in-house counsel and its Seattle

lawyer filed similar affidavits. Seattle counsel's affidavit declares:

> Plaintiffs allege that Fisons failed to provide adequate warnings of possible dangers associated with the use of Somophyllin Oral Liquid, a theophylline-based prescription medication distributed by Fisons. . . . [Plaintiffs'] discovery requests are extremely broad in scope. Many of these discovery requests are not reasonably related to plaintiffs' failure-to-warn allegations against Fisons.
>
> Following receipt of plaintiffs' First Request for Production, I traveled to Fisons in Bedford, Massachusetts in order to ascertain firsthand the scope and extent of documents responsive to plaintiffs' request for production. At that time I confirmed that to produce all of the documents responsive to plaintiffs' catch-all requests would be extremely burdensome and oppressive to Fisons. Between one and two million pages of documents, most of which have no colorable relevance to the issues in this action, would have to be located, assembled, and made available for review or copying. The time, expense, and intrusion upon the day-to-day business activities of Fisons would be immense.
>
> While at Fisons I identified those documents reasonably related to the claims asserted by plaintiffs in this litigation and arranged to have them copied and forwarded to Seattle for production to plaintiffs.

Clerk's Papers, at 6301-02.

The affidavit goes on to say that the drug company had "agreed to make available those documents reasonably related to plaintiffs' allegations against Fisons." Clerk's Papers, at 6302.

In its memorandum to the court in support of the motion for a protective order, the attorney for the drug company outlined the documents contained in the regulatory file on Somophyllin Oral Liquid. That file purportedly contained complete information regarding the drug including: Summaries of adverse reactions associated with the use of the medication that had been reported to Fisons; all promotional or advertising material disseminated by Fisons *with regard to the medication*; the complete product file for Somophyllin Oral Liquid, which contained records of communications

with the Food and Drug Administration, internal memoranda, and miscellaneous medical literature regarding theophylline. The memorandum goes on to tell the court

> In short, Fisons' Regulatory File for Somophyllin Oral Liquid contains all or nearly all documents in Fisons' possession that are reasonably related to plaintiffs' failure-to-warn allegations.

Clerk's Papers, at 6277. A footnote to this comment states "Fisons has also agreed to make available to plaintiffs an index of periodicals maintained in Fisons' internal library as well as certain other documents." Clerk's Papers, at 6277 n.3.

The drug company's responses and answers to discovery requests are misleading. The answers state that all information *regarding* Somophyllin Oral Liquid which had been requested would be provided. They further imply that all documents which are relevant to the plaintiffs' claims were being produced. They do not specifically object to the production of documents that discuss the dangers of theophylline, but which are not within the Somophyllin Oral Liquid files. They state that there is no relevant information within the cromolyn sodium product files.

It appears clear that no conceivable discovery request could have been made by the doctor that would have uncovered the relevant documents, given the above and other responses of the drug company. The objections did not specify that certain documents were not being produced. Instead the general objections were followed by a promise to produce requested documents. These responses did not comply with either the spirit or letter of the discovery rules and thus were signed in violation of the certification requirement.

The drug company does not claim that its inquiry into the records did not uncover the smoking gun documents. Instead, the drug company attempts to justify its responses by arguing as follows: (1) The plaintiffs themselves limited the scope of discovery to documents contained in Somophyllin Oral Liquid *files*. (2) The smoking gun documents were not intended to relate to Somophyllin Oral Liquid, but rather were intended to promote another product of the drug com-

pany. (3) The drug company produced all of the documents it agreed to produce or was ordered to produce. (4) The drug company's failure to produce the smoking gun documents resulted from the plaintiffs' failure to specifically ask for those documents or from their failure to move to compel production of those documents. (5) Discovery is an adversarial process and good lawyering required the responses made in this case.

If the discovery rules are to be effective, then the drug company's arguments must be rejected.

First, neither the child nor the doctor limited the scope of discovery in this case. Attorneys for the child, the doctor and the drug company repeatedly referred to both theophylline and Somophyllin Oral Liquid. There was no clear indication from the drug company that it was limiting all discovery *regarding* Somophyllin Oral Liquid to material from that product's file. Nor was there any indication from the drug company that it had information about theophylline, which is not a Fisons "product", or information *regarding* Somophyllin Oral Liquid that it was not producing because the information was in another product's file. The doctor was justified in relying on the statements made by the drug company's attorneys that all relevant documents had been produced and he cannot be determined to have impliedly, albeit unknowingly, acquiesced in limiting the scope of discoverable information.

Second, the drug company argues that the smoking gun documents and other documents relating to theophylline were not documents *regarding* Somophyllin Oral Liquid because they were intended to market another product. No matter what its initial purpose, and regardless of where it had been filed, under the facts of this case, a document that warned of the serious dangers of the primary ingredient of Somophyllin Oral Liquid is a document *regarding* Somophyllin Oral Liquid.

Third, the discovery rules do not require the drug company to produce only what it agreed to produce or what it was ordered to produce. The rules are clear that a party

must *fully* answer all interrogatories and all requests for production, unless a specific and clear objection is made.[88] If the drug company did not agree with the scope of production or did not want to respond, then it was required to move for a protective order. In this case, the documents requested were relevant. The drug company did not have the option of determining what it would produce or answer, once discovery requests were made.[89]

Fourth, the drug company further attempts to justify its failure to produce the smoking guns by saying that the requests were not specific enough. Having read the record herein, we cannot perceive of *any* request that could have been made to this drug company that would have produced the smoking gun documents. Unless the doctor had been somehow specifically able to request the June 30, 1981, "dear doctor" letter, it is unlikely that the letter would have been discovered. Indeed the drug company claims the letter was not an official "dear doctor" letter and therefore was not required to be produced.

Fifth, the drug company's attorneys claim they were just doing their job, that is, they were vigorously representing their client. The conflict here is between the attorney's duty to represent the client's interest and the attorney's duty as an officer of the court to use, but not abuse the judicial process.

> [V]igorous advocacy is not contingent on lawyers being free to pursue litigation tactics that they cannot justify as legitimate. The lawyer's duty to place his client's interests ahead of all others presupposes that the lawyer will live with the rules that

---

[88]CR 33(a); CR 34(b).

[89]*Gammon v. Clark Equip. Co.*, 38 Wn. App. 274, 281, 686 P.2d 1102 (1984) (defendant may not unilaterally determine what is relevant to plaintiff's claim and defendant's remedy, if any, was to seek a protective order pursuant to CR 26(c)), *aff'd*, 104 Wn.2d 613, 707 P.2d 685 (1985); *Taylor v. Cessna Aircraft Co.*, 39 Wn. App. 828, 836, 696 P.2d 28 (defendant and its counsel could not unilaterally decide what was relevant in a particular case, defendant's remedy was to seek a protective order, not to withhold discoverable material), *review denied*, 103 Wn.2d 1040 (1985).

govern the system. Unlike the polemicist haranguing the public from his soapbox in the park, the lawyer enjoys the privilege of a professional license that entitles him to entry into the justice system to represent his client, and in doing so, to pursue his profession and earn his living. He is subject to the correlative obligation to comply with the rules and to conduct himself in a manner consistent with the proper functioning of that system.

Schwarzer, *Sanctions Under the New Federal Rule 11 — A Closer Look*, 104 F.R.D. 181, 184 (1985).

Like CR 11, CR 26(g) makes the imposition of sanctions mandatory, if a violation of the rule is found.[90] Sanctions are warranted in this case. What the sanctions should be and against whom they should be imposed is a question that cannot be fairly answered without further factual inquiry, and that is the trial court's function. While we recognize that the issue of imposition of sanctions upon attorneys is a difficult and disagreeable task for a trial judge, it is a necessary one if our system is to remain accessible and responsible.

Misconduct, once tolerated, will breed more misconduct and those who might seek relief against abuse will instead resort to it in self-defense.

Schwarzer, 104 F.R.D. at 205.

In making its determination, the trial court should use its discretion to fashion "appropriate" sanctions. The rule provides that sanctions may be imposed upon the signing attorney, the party on whose behalf the response is made, or both.[91]

In determining what sanctions are appropriate, the trial court is given wide latitude.[92] However certain principles guide the trial court's consideration of sanctions. First, the least severe sanction that will be adequate to serve the

---

[90]*Cascade Brigade v. Economic Dev. Bd.*, 61 Wn. App. 615, 619, 811 P.2d 697 (1991) (interpreting CR 11); *Amendments to the Federal Rules of Civil Procedure*, 97 F.R.D. 220 (1983).

[91]CR 26(g).

[92]*In re Guardianship of Lasky*, 54 Wn. App. 841, 855, 776 P.2d 695 (1989).

purpose of the particular sanction should be imposed.[93] The sanction must not be so minimal, however, that it undermines the purpose of discovery. The sanction should insure that the wrongdoer does not profit from the wrong.[94] The wrongdoer's lack of intent to violate the rules and the other party's failure to mitigate may be considered by the trial court in fashioning sanctions.[95]

 The purposes of sanctions orders are to deter, to punish, to compensate and to educate.[96] Where compensation to litigants is appropriate, then sanctions should include a compensation award. However, we caution that the sanctions rules are not "fee shifting" rules.[97] Furthermore, requests for sanctions should not turn into satellite litigation or become a "cottage industry" for lawyers. To avoid the appeal of sanctions motions as a profession or profitable specialty of law, we encourage trial courts to consider requiring that monetary sanctions awards be paid to a particular court fund or to court-related funds.[98] In the present case, sanctions need to be severe enough to deter these attorneys and others from participating in this kind of conduct in the future.

The trial court's denial of sanctions is reversed and the case is remanded for a determination of appropriate sanctions.

In sum, we hold as follows: Dr. Klicpera did have standing to bring a Consumer Protection Act claim and damages for

---

[93]*Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 225, 829 P.2d 1099 (1992); *In re Guardianship of Lasky*, 54 Wn. App. at 855.

[94]*Gammon v. Clark Equip. Co.*, 38 Wn. App. at 282 (sanction award of $2,500 was disapproved for being "cheap at twice the price in the context of a $4.5 million wrongful death case").

[95]Schwarzer, at 200.

[96]*Miller v. Badgley*, 51 Wn. App. 285, 303, 753 P.2d 530, *review denied*, 111 Wn.2d 1007 (1988).

[97]*Bryant v. Joseph Tree, Inc.*, 119 Wn.2d at 228 (Andersen, J., concurring in part, dissenting in part).

[98]*See, e.g., J.M. Cleminshaw Co. v. Norwich*, 93 F.R.D. 338, 354 (D. Conn. 1981).

injury to his reputation are compensable damages under the Consumer Protection Act. However, the physician cannot, under the facts herein, recover damages for his own emotional pain and suffering under the Washington product liability act. Dr. Klicpera cannot maintain a common law negligence cause of action based upon a claim of failure to warn of a product's dangers as such claims were subsumed in the Washington product liability act. We also conclude that the trial court correctly declined to allow the Consumer Protection Act claim of Washington State Physicians Insurance Exchange & Association to go to the jury and did not err in excluding the "habit" testimony of the drug company's sales representative proffered under ER 406. The physician's claims under the laws of this state were not preempted by federal law. We also decline to overturn or reduce the jury's award of damages to the physician for loss of reputation and conclude that the trial court did not abuse its discretion in calculating the amount of attorneys' fees recoverable under the Consumer Protection Act. Finally, we hold that the trial court erred in failing to find that sanctions for discovery abuse were warranted in this case and, in that regard, remand the case to the trial court for imposition of adequate sanctions.

Affirmed in part; reversed in part; and remanded to the trial court for imposition of sanctions.

DOLLIVER, SMITH, and GUY, JJ., concur.

BRACHTENBACH, J. (concurring in part/dissenting in part) — I fully concur with the majority except on issue 2. I strongly disagree with the reasoning and result on issue 2 and respectfully dissent.

The issue is whether a drug manufacturer is liable to a physician for damages for his physical and mental injuries when the drug manufacturer proximately caused those damages because it failed to warn the physician of known risks in the use of its drug.

Plaintiff was the pediatrician treating a 2-year-old child. He prescribed a drug manufactured and distributed by defend-

ant. The jury found, and it is not here challenged, that defendant failed to adequately warn of the risks in use of its drug. The child suffered permanent brain damage.

The jury found that the resulting publicity and malpractice action against plaintiff, Dr. James A. Klicpera, damaged his professional reputation. The majority affirms that part of the special verdict.

But Dr. Klicpera contends that he suffered more than loss of or damage to his professional reputation. He personally suffered emotional damages with accompanying physical illness; that evidence will be discussed hereafter. It is for these personal damages that Dr. Klicpera sought damages under the product liability act (PLA), RCW 7.72. The jury was properly instructed as to the law of the PLA and was properly instructed as to the type of damages recoverable. The jury made its award; the trial court refused to overturn the jury verdict.

Yet the majority sets aside the jury verdict and reverses the trial court, as a matter of law. It is essential to understand that the majority reverses the jury and the trial court on a theory of its own, a theory never raised, briefed or argued by the defendant.

This dissent will first make an abbreviated review of the product liability act as it relates to this cause of action; second, I will examine the majority, and third, provide a more detailed analysis of the PLA, particularly showing that the legislative history, not examined by the majority, supports this verdict. Because I would affirm the verdict, it is necessary to examine defendant's challenges to sufficiency of proof of proximate cause and its challenges to the amount of the verdict.

The PLA contains a number of definitions which are critical to understanding it and its application, but the following are the essential considerations supporting the plaintiff's verdict. The PLA expressly recognizes a product liability claim of the very type brought here, *i.e.*, failure to discharge a duty to warn or instruct, whether negligent or innocent. RCW 7.72.010(4). Liability is imposed specifically if adequate

warnings or instructions were not provided. RCW 7.72-.030(1). The jury was instructed correctly on this phase of the law; defendant does not challenge the correctness of the PLA instructions.[99] The jury held for plaintiff on this point, so it is an established fact that the defendant is liable.

The PLA also defines who is a "claimant", *i.e.*, who is a proper person to make a product liability claim. The definition is remarkably broad: " 'Claimant' includes *any person* or entity that suffers *harm*. A claim may be asserted under this chapter even though the claimant did not buy the product from, or enter into any contractual relationship with, the product seller." RCW 7.72.010(5). Defendant argues that plaintiff doctor did not have standing to sue under the PLA, *i.e.*, defendant contends, *as a matter of law*, plaintiff was not a *claimant* as defined in the PLA. This issue was not submitted to the jury. Unless plaintiff is not a proper claimant, as a matter of law, defendant is foreclosed on this issue. *The majority never addresses this issue.*

As noted, a claimant is *any* person that suffers *harm*. The term "harm" is also strikingly broad in definition: " 'Harm' includes *any* damages recognized by the courts of this state . . . ." (Italics mine.) RCW 7.72.010(6). The definition goes on to exclude economic loss under the Uniform Commercial Code, RCW Title 62A.

The majority rests its decision against the verdict solely on the basis that plaintiff's damages are not the *type of harm* recoverable under the above definition. Majority, at 319. Thus, the majority necessarily holds that the physical and emotional suffering of plaintiff are not within "any damages recognized by the courts of this state". RCW 7.72-.010(6).

*Defendant never raises, briefs nor argues that the damages suffered by plaintiff are not within the statutory definition of "harm".* Yet this is the exclusive focus and foundation of the majority's holding. Defendant's opening brief, from the table

---

[99]Defendant assigns error to certain instructions, but only as a precaution to comply with RAP 10.3(g). Defendant makes no argument that the contents of the instructions are incorrect. Brief of Appellant, at 2.

of contents to the conclusion, raises *only* the issue of standing, *i.e.*, whether plaintiff was a proper "claimant". Opening Brief of Appellant, at i, 3, 24, 28, 30-31, 33, 82. Defendant's reply brief continues to raise only that single issue, not mentioning the majority's theory. Reply Brief of Appellant, at 5-7.

In a nutshell, defendant's only challenge is to *WHO* can be a plaintiff under the PLA; the majority's singular inquiry is *WHAT* can be recovered, describing that as "the most precise inquiry". I suggest it is the wrong question, but even if it were the issue, the majority's conclusion is contrary to Washington law and legislative history of the PLA.

The majority seems to find only two perceived policy grounds to justify its reversal. First, if recovery were allowed, "liability would potentially be endless". Majority, at 320. This merely echoes the unsupported supposition asserted by Justice Dore in *Gain v. Carroll Mill Co.*, 114 Wn.2d 254, 260, 787 P.2d 553 (1990). My answer to this dire warning of "opening the floodgates of litigation" remains the same as expressed before: "I prefer to continue with a faith in trial courts and juries to dispense appropriate justice, rather than create an unjust artificial rule based on some unsupported fear." *Gain*, at 265 (Brachtenbach, J., concurring in result only; dissenting).

The second policy ground asserted by the majority is its statement: "We would not be furthering the intent of the Legislature if we extended liability so far that drug manufacturers would be chilled in marketing products and developing new ones." Majority, at 322. The opinion reveals no authority for this significant insight into the pharmaceutical industry. Not even the source of the majority's speculation is disclosed.

This speculative ground lends no support to the majority's conclusion. In stark contrast, the Oregon Supreme Court has rendered a reasoned and rational decision rejecting the foundation upon which the majority places such emphasis. The facts are remarkably similar, except the doctor sought only economic damages. In *Oksenholt v. Lederle Labs.*, 294

Or. 213, 656 P.2d 393 (1982), the court held that a prescribing physician had a cause of action against the drug manufacturer for failure to warn as required by federal regulations, 21 C.F.R. § 200 *et seq.* (1993). The defendant argued, as does this defendant, that its duty to warn runs to the patient; that such is its exclusive duty, and thus no liability is owed to the doctor when it is the patient who suffers direct injury from the product.

*Oksenholt* makes this telling and persuasive statement:

> Affording such a remedy for injury to a physician that results from a prescription drug manufacturer's failure to supply adequate information will encourage drug manufacturers to supply that information and thus further the regulatory objective.

*Oksenholt,* at 220. When one evaluates the validity of the majority's supposition that recovery would "chill" drug manufacturers in marketing products and even in developing new ones, it must be remembered that this case did not involve the scientific complexities of some new drug. All this defendant had to do to escape liability was give the plaintiff and other doctors a fair warning of the literally lethal potential consequences of its widely used drug. Defendant knew those facts; its marketing strategy, the bottom dollar line, led to liability. Hiding the truth is what "chilled" its drug and left the plaintiff's child patient permanently brain damaged.

I turn to other reasons advanced by the majority. It correctly notes that there is no directly applicable Washington product liability case on the issue presented, whether the issue be who is a proper claimant or are these type of damages "harm" within the statute. However, the majority errs in asserting that in our prior product liability cases under the PLA, "the 'harm' involved has been for injury caused directly *by the product* to the person or the property of the claimant." (Footnote omitted.) Majority, at 320. It cites *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 763, 818 P.2d 1337 (1991); *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 840 P.2d 860 (1992). The majority's statement is not accurate and the cited cases lend it no support, but

rather support the dissent. In *Ayers,* there was a $500,000 recovery by the parents of the child who had been injured directly by the product. In *Washburn,* there was a $2 million recovery by the wife of the person injured by the product. Neither the parents nor the wife suffered injuries caused directly by the product. They were persons whose emotional injuries alone were linked to the person who was injured by the product, just as plaintiff doctor claims injuries linked to the person who was injured by the product.

Next, the majority relies by analogy on *Gain v. Carroll Mill Co., supra.* It too provides no support for the majority. The sole holding in *Gain* is that the mental distress of family members who were not present when their son and brother were killed is not *foreseeable as a matter of law. Gain,* at 261. The holding in *Gain* is entirely irrelevant here; foreseeability is not an issue. We recently so held: "foreseeability is not an element of a failure to warn claim arising under subsection (b)" of RCW 7.72.030(1). *Ayers,* at 765.

I can discern no other rationale in the majority other than that discussed and rejected above. Because the majority repeatedly emphasizes what it perceives to be legislative intent in enacting the PLA, we should examine evidence of legislative intent.

First, we should consider the only theory raised by the defendant, the one never considered by the majority, *i.e.,* that the plaintiff doctor lacked standing because he is not a "claimant" as defined by the PLA. To read the plain language of the statute answers the question. RCW 7.72.010(5) could hardly be stated more broadly: "Claimant. 'Claimant' means a person or entity asserting a product liability claim . . . 'Claimant' *includes any person* or entity *that suffers harm.*"

Up to this point in the statutory definition of claimant, there is nothing which suggests the limitation created by the majority. However, the Legislature went further and enlarged the scope of the definition by providing: "A claim may be asserted under this chapter even though the claimant did

not buy the product from, or enter into any contractual relationship with, the product seller." RCW 7.72.010(5).

The legislative history rejects the restrictive reading rendered by the majority. The report of the Senate select committee clearly illustrates the intent that the definition of "claimant" was intended to be broad and sweeping. That report states: "Claimant. Recovery may be had under this act by *any person* or entity *which suffers harm, including those not in privity with the product seller, bystanders as well as product users.*" (Italics mine.) Senate Journal, 47th Legislature (1981), at 630.

It is critical to note what relationship with the product the claimant *does not* have to establish. The claimant need not have bought the product from the product seller. The claimant need have no privity with the product seller. By the Legislature's own declaration of intent, claimants may include *bystanders* with no connection to the product. Note that the Legislature declared that "claimant" *includes* all these potential plaintiffs, and not that it is restricted to those classes.

Within these very wide boundaries, is a physician who prescribes a drug without proper warning of its dangers (an established fact in this case) a claimant? We know from *Ayers v. Johnson & Johnson Baby Prods. Co.*, *supra*, and *Washburn v. Beatt Equip. Co.*, *supra*, that parents and spouses are claimants, even if not bystanders. Yet the Legislature went so far as to mention specifically bystanders. Nowhere is there a suggestion that there must be some familial relationship.

If mere bystanders are included, what relationship does the prescribing physician occupy? The duty to warn about the drug ran to the plaintiff doctor. The jury was so instructed in an instruction which defendant does not challenge. Instruction 17. The Oregon court in *Oksenholt v. Lederle Labs.*, *supra*, clearly understood this:

> By law, a prescription drug manufacturer cannot sell its products to the consumer without the physician's approval. The

patient must rely on the physician to sift through the relevant literature, to match a medicine's indications and contraindications with the patient's ailment and to prescribe the appropriate drug. The [federal] regulations presume this three-way relationship and were designed to aid the physician. We hold that physicians are in the class protected by the [federal] regulations.

*Oksenholt*, at 219-20.

The telling point is made entirely clear in *Carmichael v. Reitz*, 17 Cal. App. 3d 958, 989, 95 Cal. Rptr. 381 (1971). The court, in considering the necessity of a warning from the drug manufacturer to the physician, stated: "Because of the foregoing law [relating to warnings to the physician], *it is the prescribing doctor who in reality stands in the shoes of 'the ordinary consumer.'* " (Italics mine.) The court went on to hold it was proper to instruct that the drug had to be dangerous to an extent beyond that which could be contemplated by the physician. In this case, the jury was so instructed in this language: "you shall consider whether the product was unsafe to an extent beyond that which would be contemplated by an ordinary physician user." Instruction 17.

If we start with the definition of the statute that a "claimant" includes *any* person who suffers harm, and add the fact that the statute does not require the claimant to be in privity or even be a buyer, and then add the clear legislative history that "even bystanders" are included, what is there which would exclude the plaintiff-prescribing physician? We must eliminate any question of foreseeability. There is no requirement of any special relationship, such as a family member. The statute is perfectly clear that it includes all of the above categories, but does not limit the definition to those described.

Instead of a mere bystander, Dr. Klicpera was an essential participant in the distribution and ultimate sale of defendant's product. By law, without his participation, defendant could not have sold its product. I suggest the California court was exactly correct in stating "it is the prescribing doctor who in reality stands in the shoes of 'the ordinary consumer.' " *Carmichael*, at 989.

I would hold that plaintiff was a proper claimant to bring this PLA action, thereby rejecting the only challenge mounted by the defendant and never answered by the majority.

Because the majority chose to create an entirely separate issue from that raised by defendant, it is necessary to answer that issue. The majority states the issue which it alone creates as follows: "We perceive the most precise inquiry here to be whether these pain and suffering damages are the type of 'harm' contemplated as recoverable by the Legislature under the PLA." Majority, at 319.

The statute provides the definition of "harm" to be: " 'Harm' includes any damages recognized by the courts of this state." RCW 7.72.010(6). It is absolutely clear that the Legislature was referring *only* to the type of damages recoverable, not to the person who was the claimant because the same statute contains a proviso that "the term 'harm' does not include direct or consequential economic loss under Title 62A RCW."

The majority *never denies that emotional distress with accompanying pain and suffering* are types of damages recognized by the Washington courts. That is all the statute requires. Indeed, the majority cannot deny that recovery for mental distress has long been recognized as a proper element of damages in this state. Recovery was permitted for mental distress as early as 1918 in *Redick v. Peterson,* 99 Wash. 368, 169 P. 804 (1918). There has been a long debate in the cases about the necessity of physical harm as a condition of recovering for emotional distress, but that issue is not raised here and there were physical injuries. The physical impact requirement was abandoned 17 years ago, but our courts have not experienced the endless litigation and fraudulent claims then predicted, as the majority now predicts endless liability. *Hunsley v. Giard,* 87 Wn.2d 424, 553 P.2d 1096 (1976).

The majority correctly notes that the Legislature chose not to use the definition of "harm" contained in the Model Uniform Product Liability Act (UPLA), 44 Fed. Reg. 62,713, 62,717 (1979). However, the majority fails to explore the

difference between the UPLA and the definition enacted in RCW 7.72. The definition of "harm" in the model act is much more restrictive and might justify the result of the majority, but the Legislature intentionally and knowingly *rejected* that restrictive definition which might support the majority. The UPLA included four definitions of "harm", including:

> (3) mental anguish or emotional harm attendant to such personal physical injuries, illness or death; and (4) mental anguish or emotional harm caused by the claimant's being placed in direct personal physical danger and manifested by a substantial objective symptom. . . .

44 Fed. Reg. 62,717 § 102(F) (1979).

Under said section 102(F)(3) of the UPLA, recovery here would be dependent upon physical injuries or illness. As discussed hereafter, the evidence may well support recovery under such definition, depending upon its interpretation, but it is not an issue raised by the defendant or the majority. Clearly, under subsection (F)(4), quoted above, Dr. Klicpera would be denied recovery because he was not placed in direct personal physical danger.

It is obvious that the UPLA proposed a much more restrictive definition of "harm". It is highly significant and relevant here that the definitions in RCW 7.72 "are taken substantially from the Uniform Product Liability Act". Senate Journal, 47th Legislature (1981), at 629. But when it came to defining "harm", the Legislature rejected the more restrictive definition in the UPLA. Intent to allow a much broader *type* of damage recovery is apparent. The select committee report states: "(6) Harm. The Select Committee has chosen *not* to utilize the definition of 'harm' contained in the UPLA, and *instead* has adopted a *broad definition* allowing for the *continued development* of the concept through case law." (Italics mine.) Senate Journal, 47th Legislature (1981), at 630.

I suggest that this legislative declaration of intent destroys the majority's claim that its restrictive vision of legislative intent furthers legislative intent. The question is not what the majority wants to accomplish, but rather what the Legis-

lature put in writing about its intent. First, it rejected the narrow definition of the UPLA. Second, it *instead* adopted a *broad definition* which allowed for *continued development* of the concept of recoverable damages. There is nothing in the past several decades of this court's opinions which could lead the Legislature to believe that a broad definition and continued development of the concept would mean a more restrictive recovery. Quite the contrary.

In short, there is nothing in the majority opinion which convincingly demonstrates that the *type of damages* in the PLA verdict in this case does not constitute damages "recognized by the courts of this state". That is exactly what the majority has to show to justify its conclusion and result because that is the precise requirement of RCW 7.72.010(6).

The jury instruction given on damages is exactly the standard instruction one would expect under our existing law. It included the following as an element the jury could consider if it found for the plaintiff: "the pain and suffering, both physical and mental, experienced and reasonably certain to be experienced in the future." Instruction 29. While the majority holds, as a matter of law, a verdict pursuant to this instruction was error, not even the defendant claims it to be an erroneous statement of the type of damages recoverable under the statutory definition of "harm".

Because plaintiff has standing under the PLA and I believe the majority is incorrect in using an analysis of "harm" to reverse, it is necessary to consider two arguments which are raised by defendant.

First, defendant argues there was insufficient evidence of proximate cause. Defendant takes the improbable position that: "As a matter of law, a plaintiff's testimony that he would have acted differently if there had been a stronger warning is insufficient to establish proximate cause." Opening Brief of Appellant, at 44. On its face that contention is without merit and the cases cited do not support it, despite defendant's assertions as to what those cases hold. At best,

its description of the holdings of cited cases is incomplete, if not outright misleading.

There is no question but that Dr. Klicpera testified that he would not have treated the child patient with the drug had he been properly warned of its dangers, and that, since learning of those dangers, he has stopped prescribing the drug. Verbatim Report of Proceedings, at 1968, 1081. This testimony alone was sufficient evidence of proximate cause to go to the jury and to support the verdict.

In support of the statement quoted above, defendant cites *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 144, 727 P.2d 655 (1986), which does not hold what defendant represents. What *Baughn* did hold, correctly, is that whether warnings were adequate or not, failure to warn was not a cause in fact because the purchaser already knew of the dangers in the vehicle and had warned the injured child of the very danger for which they contended a warning was needed. Defendant's representation of the holding in *Greiner v. Volkswagenwerk Aktiengesellschaft*, 429 F. Supp. 495 (E.D. Pa. 1977) is equally misleading. Defendant states: "The court held that the plaintiff's bare allegation that she would not have bought the car if there had been a stronger warning was insufficient as a matter of law." Opening Brief of Appellant, at 45. In fact, the plaintiff was not the buyer of the automobile and did not testify that she would not have bought it if warned. The holding was that the jury could not speculate what she would have said had she been asked.

This dissent need not be extended by an examination of each case cited by defendant because none holds what defendant claims. Counsel responsible for writing this portion of the brief should consult RPC 3.3 — Candor Toward the Tribunal.

In *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 754-55, 818 P.2d 1337 (1991), we rejected a similar claim about speculation of the effect of a warning and proximate cause. We stated that to overturn a verdict on such basis: "This court must be prepared to conclude that no reasonable person could infer, as did the jury, that a warning would have altered the [plaintiffs'] behavior." *Ayers*, at 755.

The evidence in *Ayers* did not permit such a conclusion and without question the positive testimony of Dr. Klicpera, cited above, was sufficient and does not permit such a conclusion.

Finally, defendant attacks the PLA verdict as (1) not supported by substantial evidence, or (2) such that it should shock the conscience of the court, or (3) the result of passion and prejudice. Defendant claims all three grounds exist.

As to the sufficiency of the evidence, defendant describes it as minimal. While the plaintiff was not verbose on the subject, he testified that he developed at least a gastritis or an ulcer for which he was being treated by a gastroenterologist. He described severe abdominal pain. He had never had those difficulties before. He positively related those problems to the stress arising from the litigation. He had loved his pediatric work because he liked taking care of kids. Now he does not enjoy it as much and considered going into administration.

The doctor testified to a changed relationship with his family. He described himself as hard to live with, spending less time with his children, and a lot less time with his wife. He summed it up as "We don't get along as well as I guess as we used to." His wife testified that he had become uncommunicative. He was on a prescribed medication for his stomach difficulties which caused him to awaken a lot at night. There was substantial evidence before the jury.

The majority has reviewed thoroughly and ably the standards which govern appellate review of the amount of a jury verdict. Majority, at 329-32. I need not repeat them, but they lead to the conclusion that we should not disturb the jury verdict.

Comment, however, is appropriate on defendant's claim that the amount should shock the conscience of the court. In its 2-page argument, defendant's only argument is a comparison of this verdict with other cases. As the majority notes: "In *Washburn*, we emphatically disallowed such comparisons . . .." (Footnote omitted.) Majority, at 331. Thus, we give no consideration to defendant's argument on this point.

The third challenge is that the verdict was the result of passion and prejudice by the jury. Again, I need not repeat the applicable standards of review fully set out by the majority. Majority, at 332-34. Because defendant makes the same arguments about both of the verdicts, that is, the verdict under the Consumer Protection Act and the verdict under the PLA, the majority's rejection of those arguments under the CPA is equally applicable to the PLA verdict. Therefore, the PLA verdict was not the result of passion and prejudice for those same reasons.

However, I must note an egregious lack of candor in defendant's argument regarding passion and prejudice. The defendant states: "The trial court, in ruling on the JNOV/new trial motion, stated that the size of the jury's award did 'startle' his conscience." Verbatim Report of Proceedings, at 4366. Because of the deference we give the trial court on this question and because a verdict is strengthened by denial of a new trial by the trial court, the above quotation could be highly significant. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 271, 840 P.2d 860 (1992).

When one goes to the record and reads the *entire* statement of the trial court, it is obvious that the defendant's statement, quoted above, is at best misleading and more accurately a plain attempt to misrepresent the ruling and to mislead this court. This is what the trial court said: "I'm not able to say that the verdict shocked the conscience of the Court. I will say that it — I blinked and it did startle my conscience. But I can't really say that it shocked my conscience or it was a result of passion or prejudice." Verbatim Report of Proceedings, at 4366. In conclusion, I agree with the majority on every issue, and its disposition of those issues, except as to issue 2 on which I would affirm.

UTTER and JOHNSON, JJ., concur with BRACHTENBACH, J.

Reconsideration denied October 22, 1993.