# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MELISSA GRAVES and BRYAN GRAVES, husband and wife; BRYAN GRAVES as Guardian Ad Litem for MAKENA GRAVES, a minor, | No. 78616-4-I |
| Plaintiffs, | DIVISION ONE |
| | UNPUBLISHED OPINION |
| v. | |
| JOSHUA WELSHANS and JANE DOE WELSHANS, husband and wife; and STAFF PRO, INC., a foreign corporation, and AEG LIVE NW, LLC, a foreign corporation; and STOOPID TOURING, INC., d/b/a the band SLIGHTLY STOOPID, a California ·Corporation, | FILED: August 5, 2019 |
| Defendants, | |
| and | |
| TED BUCK, | |
| Appellant. | |

MANN, A.C.J. — Attorney Ted Buck challenges a trial court's imposition of monetary sanctions for violations of orders in limine. Because the record establishes an adequate basis for imposition of sanctions, the trial court did not abuse its discretion. We affirm.

I.

Melissa Graves was attending an outdoor music concert when another concertgoer, Joshua Welshans, decided to breach a security barrier, climb up onto the stage, and launch himself into the crowd. Welshans landed on Graves, seriously injuring her. Graves sued Welshans, Slightly Stoopid (the band), AEG Live NW, Inc. (the concert promoter), and Staff Pro, Inc. (the security and crowd management company hired by the venue). Graves reached a settlement with Slightly Stoopid and AEG, and the case proceeded to trial against Welshans and Staff Pro. Ted Buck represented Staff Pro.

A.

All parties filed motions in limine. Relevant to this appeal are the trial court's orders on the following motions.[1]

1.

At the time of her injury, Graves and her family lived in a three-story home with a spiral staircase. Because she had extreme difficulty getting from floor to floor after the injury, Graves originally made a claim for damages related to modifying her existing home so that she could continue to live in it. The modification proved unfeasible, and by the time the case proceeded to trial, Graves had moved to a new home. Graves abandoned the claim related to the home modification.

---

[1] Only the court's rulings on Welshans's motions in limine were memorialized in a written order. The trial court informed parties that they were welcome to submit written orders reflecting the court's rulings, but that "[c]andidly, it's not necessary. The record is the record."

Graves moved to exclude any evidence that she retained an expert to perform a home modification analysis. Staff Pro agreed, and the trial court granted the motion.

Graves subsequently moved to prohibit any party from "directly or indirectly mentioning, referring to, interrogating concerning, or attempting to convey to the jury in any manner the fact that the Plaintiffs have changed their residence." Graves argued that "[e]vidence that the Plaintiffs moved their residence will generate jury speculation about the source of the money to fund the move." Staff Pro objected, arguing that "there's going to be a number of photos and other items that are shown to the jury of Ms. Graves in her old residence when I think she had difficulty moving around and the jury needs to be informed that she is now in this new residence where she may not have those same difficulties." Staff Pro requested the trial court reserve ruling on the motion. The trial court agreed:

> I think I need to know more. The court does reserve on this. I will say that it may very well be impractical not for this evidence to come forth given the damage issue.
> . . . .
> So we might be looking at, again, a curious juror may make a certain inference, what have you, but would not expect that line to be crossed and that or arguing what's improper, which is, oh, there must have been – how did you have this money to move into this new house, et cetera. I mean, that's their concern, so that's likely, that's likely where we're headed just to telegraph that to you.

2.

Graves moved to exclude evidence of "the fact and the amount of the settlement" with Slightly Stoopid and AEG, pursuant to ER 408.[2] The trial court ruled that it would apply ER 408 and exclude "evidence related to the settlement." The court noted that "this rule also does not require exclusion when the evidence is offered for another purpose," and informed parties that if they planned to do so, "we discuss that outside the presence of the jurors."

Graves subsequently sought to remove Slightly Stoopid and AEG from the case caption, arguing that the jury would speculate about the existence of and amount of a settlement. The trial court granted the motion to amend the caption, but stated: "The fact that other parties were at play is part of the trial. Jurors will know that. This will also serve to reflect the reality of what has occurred."

3.

Part of Staff Pro's defense was that Welshans committed the intentional tort of battery, entitling it to segregation of damages. Welshans moved to preclude any testimony about his intent. He also moved to preclude Staff Pro

---

[2] ER 408 provides that:
In a civil case, evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

from arguing that he committed battery in its opening statement. Graves similarly moved to preclude "opinion[s] regarding the nature of Welshans' conduct – whether intentional, negligent or reckless."

Staff Pro agreed that it did not plan to discuss the legal elements of battery in its opening statement, but did plan to argue that Welshans "intended to leap off the stage and into the crowd." As to Welshans's intent, the court ordered as follows:

> All right. The motion is granted in part. That is, there's agreement that experts ought not be testifying to their insight about subjective state of minds, but I don't think at this point the court can go further than that.

The court also granted the motion precluding Staff Pro from arguing that Welshans committed battery in its opening statement.

### 4.

Staff Pro moved to exclude any speculation that Welshans would have acted differently had there been more security personnel barricading the stage. The trial court granted the motion.

### B.

Parties gave opening statements on January 9, 2018. Staff Pro made reference to AEG and Slightly Stoopid as follows:

> MR. BUCK: In fact, the people who say that AEG did something wrong were Plaintiffs' own experts, because they sued AEG and they sued the band. And their expert said, "AEG," what was it? "It was a grievous deviation for" –
>
> MR. BULZOMI: Excuse me, Your Honor. I object to the content of the opening statement. Pretrial order.

THE COURT: Objection sustained. You may continue.

MR. BULZOMI: And a corrective instruction to the jury to disregard it.

THE COURT: The jurors will disregard the most recent statement regarding claims. Counsel, you may continue.

MR. BUCK: May we have a sidebar, Your Honor?

THE COURT: Not at this time.

During a later sidebar conference, Graves argued that Staff Pro's reference to the other parties violated the order in limine.

> There was a clear and deliberate violation of the motion in limine. The Court ruled that the fact that we sued AEG and Slightly Stoopid was not to be mentioned and Counsel drove right through it and mentioned it. It was deliberate. It wasn't accidental. It was tactical. It puts us into the position of having to hope that the Court's instruction to disregard somehow unrings that bell. And it puts us in the position of maybe having to move for a mistrial.
> . . . .
> This has to stop now. And I think Counsel should be sanctioned.

Staff Pro objected, arguing that it had not mentioned the settlement nor made any statements subject to exclusion by ER 408.

> We informed the Court that we intended to follow ER 408. The fact that they were parties has nothing to do with ER 408, which is the only basis that was set forth in the motion in limine for the exclusion of evidence of settlement.

> We had a conversation with this Court before the case ever started about the fact that these other entities being parties was going to come out. It can't help but come out and there is no rule of evidence which says that it shouldn't come out. And this Court has never ruled that that fact should not come out.

The trial court responded as follows:

> But, Mr. Buck, a curious juror is now wondering, "Oh, others have been, not only are we going to be asked to consider who is responsible." That was what opening statements were all about,

this party is more responsible, they should have done X. They should have done Y. But now on not a factual plane, but a legal plane, a curious juror is wondering, "What became of those lawsuits? Has that happened before? What did those jurors do? And what were those settlements? And how does that inform our verdict form when we try to allocate percentage of liability?" That's the problem.

And the fact that you don't see that as a problem is another problem, Counsel.

Graves argued that Staff Pro could not have misunderstood the court's intent that Slightly Stoopid and AEG not be referred to as parties because it had granted the motion to remove them from the case caption.

MR. BULZOMI: Well, we moved to amend the caption to reference, to remove reference to those parties so the jury wouldn't be speculating why they've been sued and why they're not here. If this doesn't run through that motion, I don't know what does. And you granted that motion, Your Honor.

THE COURT: Correct, as well.

The court declined to impose sanctions at that time. It suggested the parties consider drafting a limiting instruction.

The following day, January 9, Staff Pro cross-examined Anthony Davis, Graves's expert witness on crowd security and management. Staff Pro indicated it planned to ask Davis what materials he relied upon in forming his opinions. Graves objected, arguing that the materials included pleadings indicating that Slightly Stoopid and AEG were former parties. Staff Pro argued that such questioning did not violate the order in limine because it did not pertain to the settlement. The trial court stated: "The concern is you're not going to say it directly, but you're going to allow that reasonable inference from a juror. That's the concern, and that's called Evidence Rule 403." The trial court accused Buck

of encouraging the jury to speculate regarding the existence of a settlement with Slightly Stoopid and AEG.

> I'm not sure you do understand, Mr. Buck, because you don't want to have any sort of sanitation. You want to get into everything that's occurred in the case, except, I guess, what the ultimate settlements have been.

The trial court encouraged parties to craft a limiting instruction addressing the status of Slightly Stoopid and AEG. The parties agreed that the jury should be instructed as follows:

> You may hear reference to AEG and Slightly Stoopid as parties or defendants. You are not to speculate in any way about why AEG and Slightly Stoopid are not defendants in this particular trial.

On January 10, Staff Pro continued its cross-examination of Davis, asking Davis about various statements he had made in his deposition. Buck asked if Welshans's conduct constituted a "trespass." Graves objected, arguing this called for a legal conclusion. The court sustained the objection. Buck then asked if Davis "described what Welshans did as a sucker punch." When Davis stated that he did not remember, Buck referred to a portion of the deposition where Davis stated "a stage diver like Mr. Welshans commits battery." Buck asked if it "would almost be like sucker punching an unsuspecting person, where you assault someone –" Graves again objected.

Buck also asked Davis about portions of Welshans's deposition in which Welshans stated that, if security had been more formidable, he would not have attempted to get on the stage. When Welshans objected, Buck apologized, stating that he had unintentionally violated an order protecting his own client.

8

I intended to impeach him with a piece of material in his deposition, and I started reading too early. And the plaintiffs objected and Mr. Welshans' attorney objected. And, Your Honor, they were right. I went back and looked at it last night. It not only was subject to the motion in limine, but it was stupid because it only hurts my client . . . . And I will rely on the Court's good judgment as to what an appropriate remedy would be.

I will also inform the Court that I told my client what happened, that I made a mistake, and that the results, whatever the Court determines, are my responsibility.

The court stated "The court has perceived a pattern that I'm concerned about,

but I want to take the night to think about it."

The following four days of testimony are not part of the record on appeal.

However, on January 23, Graves presented the testimony of expert witness Dr.

Kathryn Reid, a rehabilitation counselor. During cross-examination, Buck asked

the court to clarify its ruling on testimony regarding the home modification and

Graves's move.

MR. BUCK: I believe Dr. Seroussi has already testified about the new house, that the stairs are no longer a problem because of the single floor.

I want to make sure that, because this was an issue that we had talked about earlier in the case, that to my recollection of that testimony was accurate for this reason: The testimony of the current witness was that there was no addition for home modification within the life care plan because of a cost benefit analysis. And the reality, of course, is that the reason there's no home modification is because they bought a new home.

MR. BULZOMI: The reality is, Your Honor, we did a cost benefit analysis. I mean, it's tactics, it's work product, among other things.

THE COURT: So what are you asking of the Court?

MR. BUCK: I just want to make sure that this is not going to tread upon any of your rulings. As I understand it, I don't think it will, but I felt in an abundance of caution I should do that.

9

THE COURT: I think we're on the same page, correct?

MR. BULZOMI: So is he permitted to inquire about the move?

THE COURT: He's – no. He's entitled to inquire to track with the direct examination, which was it was a cost benefit analysis.

Buck proceeded to ask Dr. Reid about the home modification.

MR. BUCK: And you were asked in direct examination about an item that used to be on the life care plan that is no longer, and that would be the home modification that was originally bid out by Braitmayer – Brightmeyer [sic]; is that right?

DR. REID: Yes.

MR. BUCK: And that was described as a cost benefit analysis that didn't work out. But isn't – the real reason is that they recently bought a new house that didn't require –

MR. BULZOMI: Objection, Your Honor. Motion in limine.

THE COURT: Sustained. The jurors will disregard the most recent question.

After the jury was excused for the afternoon recess, Graves argued that Buck's questions violated the order in limine. Buck denied that he had intentionally violated the court's order:

Your Honor, that isn't – that isn't what I heard at all. I specifically brought this attention to the Court – this to the Court's attention – because she said that the reason that they didn't have that in the life care plan was because of a cost benefit analysis, which is not true. The truth is they didn't need it. Braitmayer had done an evaluation of their old house. The new house doesn't require those changes. That's specifically why I brought it up. And I [did] not hear the Court say anything about me not being able to ask about that. For heaven's sakes, I had just asked you about this. And that is not what you ruled, Your Honor. I don't – I didn't – frankly, I didn't understand why you sustained the objection.

10

The court responded: "So I had ruled that you can inquire about the cost benefit analysis but not the specifics of the house and the move. We'd dealt with that pretrial." The court sua sponte announced that it would impose monetary sanctions against Buck:

> So a curious juror is wondering: Where would those funds come from. And we'll recall earlier motions in limine that were violated, such as: Without Court permission and in violation of the then motion in limine to get into reference to other parties and lawsuits. That was after the motion in limine that was violated with regard to the cross-examination of the witness Davis. That's in addition to the motion in limine that was – that we heard, then violated, when Mr. Buck launched into "assault and battery." This is in addition to the cross-examination expert, which brought in another illegitimate piece of evidence, that was the hindsight intention of Mr. Welshans. And now not only referencing a new home but referencing that it was purchased.

> So the – it's possible Mr. Buck misunderstood the Court's ruling here, oddly had sought clarification, which normally is the best practice, yet this becomes now the fifth motion in limine that's been violated by Mr. Buck.

> Terms are imposed on Mr. Buck in a substantial degree. The exact amount will be determined at the end of trial and it will be informed by the balance of conduct.

On February 9, 2018, the parties filed a notice of settlement. The trial court subsequently entered a written order imposing sanctions, memorializing its earlier oral ruling as follows:

> During the course of jury trial, counsel for defendant Staff Pro, Mr. Ted Buck, violated multiple Orders In Limine on, at least, four occasions. When it became apparent during the course of trial that such pattern was evident (and after considering argument of counsel) the Court determined that these knowing violations should not be ignored nor condoned.

> Accordingly, the Court concludes that terms are required, especially in light of a previous admonishments during the trial holding the

requests for sanctions in abeyance. IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that terms in the amount of $4,000 are assessed; Mr. Buck is to pay said terms within thirty days to an independent law related charity such as the King County Bar Foundation, or to the Clerk of this Court.

Staff Pro moved for reconsideration, claiming that the record did not support the trial court's finding of multiple violations. It contended that Buck violated only one order, which was on its own motion. Staff Pro also argued that Buck was never given an opportunity to respond before the trial court imposed sanctions.

The trial court denied reconsideration and reiterated its earlier ruling:

> The Court previously held: During the course of jury trial, counsel for defendant Staff Pro, Mr. Ted Buck, violated multiple Orders In Limine on, at least, four occasions.[1] When it became apparent during the course of trial that such pattern was evident (and after considering argument of counsel) the Court determined that these knowing violations should not be ignored nor condoned.
>
> Movant argues that he violated only one court Order and challenges each and every order.[2] Plaintiffs respond that "[h]is violations cannot be taken as anything other than calculated and intentional violations done for tactical purposes in an attempt to gain an advantage before the jury. The Court's Order Sanctioning [sic] Mr. Buck is certainly appropriate under the circumstances, and even more severe sanctions would also be appropriate." As is often the case in trial and life, the truth resides in the middle ground.
>
> From the Court's more objective vantage point, the court was in the best position to assess counsel's actions, credibility, and stratagems during this multi-week trial. While defense counsel concedes that he "inadvertently" violated a court's Order, pattern illuminates intent. A review of the record illustrates just how much time was devoted to addressing Mr. Buck's compliance with pretrial motions.[3] The Court even provided notice to counsel by expressing its concern about the developing pattern.[4] It was clear that the letter as well as the spirit of the Court's Orders were violated.
>
> Accordingly, the Court denies the CR 59 Motion for Reconsideration, especially in light of a previous admonishments

12

during the trial, and in holding the requests for sanctions in abeyance. IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that terms in the amount of $4,000 are reassessed; in measuring the quality and quantity of the violations, Plaintiff's suggestion to impose more severe "sanctions" is denied. Mr. Buck is to pay said terms within fourteen days to the King County Bar Foundation, or to the Clerk of the Court.

[1] Another was deemed a misunderstanding.

[2] It is disappointing that counsel perceives no issue with his comportment, even in hindsight.

[3] Mr. Buck is a talented, experienced trial attorney who knew better.

[4] Defendant's counsel repeatedly lobbed ER 403 explosive, at the time inadmissible, topics into the trial [e.g. "parties sued/lawsuits/defendants," implying out of court settlements which invites speculation, "assault and battery", Welshans' hindsight intention, reference to plaintiffs new house that exceeded and did not track the direct examination, "summary judgment"].

Buck appeals.

## II.

## A.

As a preliminary matter, we address the request made by the King County Prosecutor's Office to file an amicus brief on behalf of King County Superior Court. Buck objects, arguing, amongst other things, that the brief is untimely.

Filing an amicus brief requires permission of the court. RAP 10.1(e), RAP 10.6(a). An amicus brief must be filed "not later than 45 days after the filing of the last brief of respondent." RAP 10.2(f)(2). Buck filed an opening brief in this court on December 17, 2018. Any respondent's brief would have been due on January 16, 2019. None of the parties chose to file a respondent's brief. On February 17, 2019, Buck filed a one-page reply brief, noting the lack of a respondent's brief.

Amicus curiae did not file its brief until April 9, 2019, 83 days after the due date for the respondent's brief and 51 days after Buck filed his reply. Because the brief is untimely under RAP 10.2(f)(2), we do not consider it.[3]

B.

Buck contends that the trial court's imposition of sanctions was an abuse of discretion because the claimed violations did not occur. We disagree; the portion of the record provided by Buck shows that at least three out of the four violations identified by the court occurred.

Contempt of court occurs when, amongst other things, an individual disobeys any lawful order of the court. RCW 7.21.010(1)(b). A court may impose a monetary sanction for contempt of court. RCW 7.21.020. The contempt statute limits the summary imposition of punitive sanctions for contempt to not more than $500 for each incident of sanctionable conduct. RCW 7.21.050(2). But a court may resort to its inherent power to punish contempt and impose sanctions exceeding this limitation if it finds that the statutory basis would be inadequate.[4] State v. Boatman, 104 Wn.2d 44, 48, 700 P.2d 1152 (1985).

This court reviews a trial court's decision to find a person in contempt and impose sanctions for abuse of discretion, and affords it wide latitude in its

---

[3] Amicus acknowledges that the brief was filed after the deadline contemplated by RAP 10.2(f)(2) but contends this court should permit the filing of the brief because no respondent's brief was filed. We reject this claim as clearly not contemplated by the appellate rules.

[4] Though the legal basis for the sanctions is not apparent from the record, the amount of the sanctions indicates the trial court exercised its inherent contempt power. In the portion of the record before us on appeal, there is no indication that the trial court made the required finding that statutory contempt sanctions were inadequate. Nevertheless, Buck does not raise this claim and we do not consider it.

14

determination of which sanctions are appropriate. State v. Dugan, 96 Wn. App. 346, 351, 979 P.2d 885 (1999); Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 338, 858 P.2d 1054 (1993). A trial court abuses its discretion when it exercises it in a manifestly unreasonable manner or bases its decision on untenable grounds or reasons. State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

We agree with Buck that referring to Slightly Stoopid and AEG as former parties or stating that they had been sued by Graves did not violate the trial court's order in limine. The parties had repeated disagreements about the manner in which former parties could be described. But the order prohibited parties only from mentioning settlement negotiations. At no time did the trial court order that Staff Pro could not discuss the former parties in any other context. In fact, the trial court, upon granting the motion to amend the caption, stated "[t]he fact that other parties were at play is part of the trial" and "[j]urors will know that." It was an abuse of discretion for the trial court to sanction Buck on this basis.

However, we conclude that Buck violated the remaining orders identified by the trial court, and that these violations served as an adequate basis for the sanctions order.[5]

As for the issue of Graves's home, the court granted Graves's motion in limine prohibiting testimony that a home modification analysis had been

---

[5] Because we conclude the trial court's sanctions were supported by the record, we do not address Buck's claim that the trial court violated due process by failing to identify an alternative basis for the sanctions.

performed. It initially reserved ruling on whether parties could mention Graves had moved to a new home. Prior to Dr. Reid's testimony, Buck asked for clarification of the court's ruling. The court ruled that Buck was prohibited from discussing the move but was "entitled to inquire to track with the direct examination, which was it was a cost benefit analysis." Nevertheless, Buck asked Dr. Reid whether Graves had "recently bought a new house."

Buck contends that Graves opened the door to discussion of the move. Dr. Reid testified that Graves did not follow through with the home modification because of a "cost benefit analysis." Buck argues this testimony was untrue – that Graves actually abandoned the home modification because the family moved – and that it "left the impression that Graves was still struggling to get around in the old, cramped house." A trial court has discretion to admit evidence that might otherwise be inadmissible if a party "opened the door" to the evidence by being the first to raise a subject during examination of a witness. Ang v. Martin, 118 Wn. App. 553, 562, 76 P.3d 787 (2003). But the trial court apparently disagreed that the door had been opened, and prohibited Buck from mentioning the move at all.[6] Buck does not challenge the merits of the trial court's evidentiary ruling, and we decline to review it.

As for the issue of Welshans's intent, the trial court clearly prohibited witnesses from speculating as to Welshans's intent in jumping from the stage, or whether Welshans would not have jumped if there had been more security.

---

[6] Buck raised the argument that the testimony opened the door in his motion for reconsideration.

Despite this, Buck repeatedly asked Davis if Welshans committed assault or battery—both of which possess an intent element. Buck also elicited testimony that the lack of security influenced Welshans's actions. Buck does not dispute that this testimony was a violation of the court's order in limine, and that he would "rely on the Court's good judgment as to what an appropriate remedy would be." It was not an abuse of discretion to sanction Buck for violating these three orders in limine.

Buck contends that the trial court deprived him of due process by imposing sanctions without specifically identifying the contemptuous behavior and by not providing him a means to respond.

Due process requires notice and an opportunity to respond before a court utilizes its inherent power to impose sanctions. Geonerco, Inc. v. Grand Ridge Properties IV, LLC, 159 Wn. App. 536, 544, 248 P.3d 1047 (2011). Here, Buck had adequate notice of the basis for the trial court's sanctions. While the sanctions order did not specifically identify each order in limine violated, both the court's oral ruling and the written order denying reconsideration specifically identified the four orders in limine at issue. Furthermore, Buck was granted an opportunity to respond. After each objection by Graves, Buck had the opportunity to explain why he did or did not believe that his conduct violated the orders in limine. And Buck filed a motion for reconsideration in which he fully briefed his objections. The trial court set a briefing schedule and permitted Staff Pro to file a

17

reply.[7] Buck fails to establish that the imposition of sanctions violated due process.

Affirmed.

_Mann, A-C.J._

WE CONCUR:

---

[7] King County Local Civil Rule 59(b) provides that a response to a motion for reconsideration may only be filed at the request of the court.